No. 20,336.

GEORGE F. BRUINGTON et al., *Appellees*, v. GEORGE F. WAGONER
and HATTIE ELLIS, *Appellants*.

### SYLLABUS BY THE COURT.

1. DEED — *Bank Stock* — *Mental Incapacity of Grantor and Assignor.*
   Evidence examined and held sufficient to sustain the findings of the
   trial court that the grantor of instruments conveying his real prop-
   erty and assigning his bank stock to defendants was mentally in-
   competent and incapable of making them at the time of their execu-
   tion and delivery.

2. PHYSICIAN—*Statutory Incompetency to Testify May be Waived.* "The
   heirs at law of one who has been treated by a physician may waive
   the provisions of the statute making a physician incompetent to testify
   to any knowledge obtained in his professional capacity from his
   patient." (*Fish v. Poorman*, 85 Kan. 237, syl. ¶ 6, 116 Pac. 898.)

Appeal from Morris district court: ROSWELL L. KING, judge.
Opinion filed March 10, 1917. Affirmed.

*M. B. Nicholson, W. J. Pirtle*, both of Council Grove, and
*J. B. Harsh*, of Creston, Iowa, for the appellants.

*D. H. Brown*, of Council Grove, *C. G. Saunders*, and *David
E. Stuart*, both of Council Bluffs, Iowa, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The plaintiffs are the children of a deceased
brother and the defendants are the children of a living sister
of the late Dr. George W. Bruington, who was for many years
a resident of Morris county, Kansas; and this lawsuit concerns
Doctor Bruington's disposition of his property when he was
about seventy-five years old, some two years before his death.

Dr. George W. Bruington came to Kansas in 1880 and re-
sided on a Morris county farm for over twenty years. He and
his wife accumulated some property, and about 1902 they re-
moved to Council Grove. In 1912 his wife died there, and a
few days thereafter he left Council Grove for Creston, Iowa,
in company with the defendants and their mother. Four days
after he left Council Grove Doctor Bruington executed deeds
conveying his Morris county land and town property to the de-

fendants, and assigned to them his bank stock.  He died in
Rosedale, Kan., in 1914; and the plaintiffs' action is to set
aside the deeds, to cancel the assignment and transfer of the
bank stock, and for an accounting of the rents and profits and
for judgment for their proportion thereof as heirs of Doctor
Bruington.  The grounds upon which the relief are sought are:

"That in the month of September, 1912, one Geo. W. Bruington, an
uncle of the plaintiffs and said defendants, then residing at Council
Grove, Kan., and who was then about seventy-five years of age, was
of feeble and unsound mind and impaired in health.  That at the time,
and for some years prior thereto and thereafter until the death of the
said Geo. W. Bruington, in the month of August, 1914, he was of un-
sound mind and incapable of transacting business or managing his own
affairs, and because of the impaired and feeble condition of his mind, and
lack of understanding, was incapable both in law and in fact of exe-
·cuting any conveyance or otherwise making any intelligent, legal or
valid disposition of his property.

"That on or about the 2d day of September, A. D. 1912, the wiife of
the said Geo. W. Bruington, also aged in years, died at Council Grove,
Kansas, and on which said occasion the defendants came to the home
of the said Geo. W. Bruington, where they remained with him and kept
themselves constantly in his company, and because of his recent be-
reavement and his childlike and simple minded condition, acquired an
excessive and undue influence over him.

· "That in the course of two or three weeks they coerced and persuaded
the said Geo. W. Bruington to accompany them to the state of Iowa,
where on the 26th day of September, A. D. 1912, taking advantage of· the
impaired and enfeebled condition of his mind and of the undue influence
which they had acquired over the said Geo. W. Bruington, and without
any consideration therefor whatever, the said defendants wrongfully, un-
lawfully and fraudulently persuaded, coerced and induced the said Geo.
W. Bruington to sign and deliver to them a certain purported deed under
and by which he purported to transfer and convey to said defendants
the following described real estate  .  .  .    and coerced the said Geo. W.
Bruington to transfer and assign to them without consideration therefor,
three certain certificates, aggregating twenty shares, of the capital
stock of the Council Grove National Bank which he then owned and held
in his own name.  .  .  .    That the said defendants obtained said pur-
ported deed from the said Geo. W. Bruington and the said purported
assignment of the said bank stock and other property for the sole and
only purpose of cheating, wronging and defrauding these plaintiffs out
of any and all right, title or interest therein or which they might in-
herit therein at the death of the said George W. Bruington, as his legal
heirs.

"That the said Geo. W. Bruington left no debts against his estate
and that no administration of his estate has ever been appointed.

"That said defendants have been wrongfully receiving and converting

to their own use all the rents and profits arising from said real estate and the dividends upon said bank stock, since the 26th day of September, 1912," etc.

The pertinent part of the trial court's judgment reads:

"And the court having heard said evidence and being duly advised in the premises does find generally for the plaintiffs and against the defendants, and that the allegations of plaintiffs' petition are true. The Court further finds that the deed and assignment of bank stock mentioned in plaintiff's petition are illegal and void, and that the said George W. Bruington, deceased, was incompetent and mentally incapable of making the same, and that said deed and assignment should be set aside and canceled."

The defendants assign error:

"First—The findings and judgment of the court are contrary to the evidence, and

"Second—The court admitted incompetent testimony on behalf of the plaintiffs."

The abstract and counterabstract setting out the evidence are unusually voluminous. Part of this evidence tended to show that for some years prior to the execution of the deeds and the assignment of the bank stock Doctor Bruington's mental powers had declined, that his wife had largely supervised his business, that he was absent-minded, listless, and forgetful of old acquaintances. He spent part of his time picking up stones, filling his pockets with cigar stumps, rusty nails, pieces of iron, pieces of dishes and glass bottles—such things as a child might do. Some years before his death he held the office of secretary of the Odd Fellows lodge, but was unable to keep its accounts and was removed for incompetency. A day or two after Doctor Bruington's wife's death defendant Wagoner called on a local attorney to arrange with him for the making of a will by Doctor Bruington which would bequeath the doctor's property to the defendants. This evidence reads:

"I suggested to him probably it was not necessary to make a will, that Dr. Bruington's property would go to his [Wagoner's] mother, Dr. Bruington's sister. He said with reference to that he had some other relatives. He said the doctor had a brother Tom. [Tom was the father of the plaintiffs.] He said Dr. Bruington did n't like this brother Tom and he did n't want him to acquire any of the property and he wanted to fix this will so they would get it. I told him that I was not quite sure in my mind whether Dr. Bruington could make a will; that I had heard some few things about him since the funeral. And I knew in a general way

Bruington v. Wagoner.

what shape he was in. I told him I would not undertake to draw the will without first seeing him and talking with him and I asked him whether he would bring Dr. Bruington up to my office and he said he would. He brought him up in the afternoon about 5 o'clock. When Dr. Bruington came in there and I spoke to him, he says, 'How do you do.' I asked him if he knew me. He said he did not. I told him who I was and invited him to have a seat. I had been practicing law all the time Dr. Bruington had been in town and I knew him before he moved to town and after he moved to town. I lived near him and passed his house several times a day. I lived a block farther north. . . . I said to Dr. Bruington then, 'Doctor Bruington, Mr. Wagoner has been talking about drawing a will for you.' He made no response. I asked him if he had talked the matter over with Mr. Wagoner, about what he wanted to do with this property. He still made no answer. I remember at that time in answer to that question that Dr. Bruington just turned around. He had a sort of a drawn expression to his face. He then turned back immediately and continued to gaze to the back part of the office. I then asked him directly if he wanted to fix this property so his brother Tom would not get any of it at his death, and he said, 'Tom—Tom lives'—he mentioned some town in Iowa. I don't remember the name of the town. He mentioned how long it had been since he had seen him. It was a number of years, I don't remember now, but he did mention the number, something like ten years. He said something about that he might go back there on a visit after he got his potatoes dug, and I just looked at Mr. Wagoner, and Wagoner said, 'Well, he is n't himself to-night,' or 'He is off to-night,' or something of that kind, and I will take him home. . . . There is one other matter—I don't know whether I ought to state it or not, I just recollect it now—but I can't recollect whether it was when Dr. Wagoner came back the next morning or the first morning I talked with him. I said something to him about doubting Dr. Bruington's capacity. He said, 'Well, I had always supposed that Mrs. Bruington owned this property, but I found out she did not.' He said that Mrs. Bruington was very anxious that he and Mrs. Ellis have this property and he thought for that reason we would be justified in straining a point. It was Dr. Wagoner that suggested that a point be strained in drawing the will. I think he used that exact language as I recollect it."

In company with the defendants and their mother, Doctor Bruington left for Iowa a day or two later, and the deeds assailed in this action were executed shortly thereafter. Aside from this there was expert evidence by physicians that Doctor Bruington was afflicted with arteriosclerosis, and senile dementia, and totally incapacitated for managing his business affairs or disposing of his property at or about the time he executed the instruments conveying his property to the defendants. That there was other and contradictory evidence is of no consequence in a court of appeal, which is bound by the

trial court's findings of fact so long as there is competent and sufficient evidence which would justify such findings, and in this case there was no trouble on that account.

The evidence which is assigned as incompetent and erroneous relates to the testimony of Doctor Miller. That testimony narrated the fact that a few months before Mrs. Bruington's death she and Doctor Bruington consulted Doctor Miller about Doctor Bruington's health.

"Q. Now, I will ask you, Doctor, if from the examination you made of him, and the observation you had of him, do you know whether or not Dr. Bruington was afflicted with any kind of disease? ·

"To which counsel for the defendants objects because incompetent, for the reason that the relation of physician and patient existed, and he can not testify in regard to it unless with the consent of the patient, under our statute. Objection by the court overruled, to which ruling of the court the defendants except."

The abstract of Doctor Miller's evidence reads:

"The witness then testified that Dr. Bruington was mentally deficient at the time he examined him, as well as he had hardening of the arteries, arteriosclerosis, which is a hardening of the inside of. the arteries, an incurable chronic condition which interfered with the circulation and predisposes degeneration of the brain cells, and as a result of said examination he was of the opinion that Dr. Bruington was suffering from dementia of old age; that such condition had existed ever since he knew him, gradually grew worse; often when he met Dr. Bruington he would n't recognize him; at other times he would. Witness attended Mrs. Bruington on the day she died, and saw Dr. Bruington. Talked with Dr. Bruington some three or four hours after Mrs. Bruington died. Doctor Bruington first shed a few tears and then acted more like a child, spoke as though his wife was out of doors and would be in shortly. That from his observation he would not judge Dr. Bruington mentally capable of transacting business or engaging in business intelligently, back to the time he examined him. His wife seemed to be doing the business for him. That he did not think it possible for Dr. Bruington to improve sufficiently to make an intelligent disposition of his property inside of the three weeks following his wife's death; the condition was progressing and the longer time elapsed the more unable he would be to dispose of property of that kind; that the Doctor died in August, 1914, from hemiplegia that would corroborate his opinion that the Doctor was afflicted with arteriosclerosis at the time of Mrs. Bruington's death."

To sustain their objection to this evidence, defendants cite Civ. Code, § 321; *A. T. & S. F. Rld. Co. v. Frazier*, 27 Kan. 463, syl. ¶ 2; *Patterson v. Cole*, 67 Kan. 441, syl. ¶ 3, 73 Pac.

54; *Insurance Co. v. Brubaker,* 78 Kan. 146, 96 Pac. 62; and *Arizona & New Mexico Ry. v. Clark,* 235 U. S. 669.

The pertinent clause of section 321 of the civil code reads:

"The following persons shall be incompetent to testify:

. . . . . . . . . . . .

"Sixth, a physican or surgeon concerning any communication made to him by his patient with reference to any physical or supposed physical disease, defect, or injury, or the time, manner or circumstances under which the ailment was incurred, or concerning any knowledge obtained by a personal examination of any such patient, without the consent of the patient.

"But if a person without objection on his part testifies concerning any such communication, the attorney, clergyman, priest or physician communicated with may also be required to testify on the same subject as though consent had been given within the meaning of the last three subdivisions."

Conceding the correctness of the general rule and that the evidence of Doctor Miller was a disclosure of professional communications from his patient and of knowledge of his patient obtained in a professional way, and therefore privileged, it has been held in this state that not only may the patient himself waive this privilege (*Armstrong v. Street Railway Co.,* 93 Kan. 493, 144 Pac. 847), but after the patient's death the privilege may be waived by his heirs at law (*Fish v. Poorman,* 85 Kan. 237, syl. ¶ 6, 116 Pac. 898). This is in accord with the best judicial thought in this country on this subject, and takes nothing from the effect of defendants' citations. (*Winters v. Winters,* 102 Iowa, 53, 63 Am. St. Rep. 428, and Note, 433; *Thompson v. Ish,* 99 Mo. 160; Note, 32 L. R. A., n. s., 73; 40 Cyc. 2397; 4 Wigmore on Evidence, §§ 2388, 2391.)

In *Fraser v. Jennison,* 42 Mich. 206, Judge Cooley said:

"The court did not err in permitting Dr. Klein to be examined by the proponents to show the condition of the decedent while he was treating him as a physician. The statute provides that 'No person duly authorized to practice physic or surgery shall be allowed to disclose any information which he may have acquired in attending any patient in his professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon.' Comp. L., § 5943. This statute, as we have held, covers information acquired by observation while the physician is in attendance upon his patient, as well as communications made by the patient to him, *Briggs v. Briggs,* 20 Mich. 34; but the rule it establishes is one of privilege for the protection of the patient; and he may waive

it if he sees fit, *Scripps v. Foster*, 41 Mich. 742; and what he may do in his lifetime, those who represent him after his death may also do for the protection of the interests they claim under him." (p. 224.)

Here the plaintiffs were the heirs at law of the deceased, and they were within their rights when they waived this statutory privilege. But an argument is made as if the defendants were also his heirs at law. Not so. Their mother was alive and a witness at the trial. She was a coheir at law with the plaintiffs. It would technically be to her interest to agree with plaintiffs that the privilege be waived, but perhaps she cared more for the interest of her children, the defendants, than for her own. At all events, the only heirs at law in court as litigants waived the privilege. It should not be forgotten, either, that defendants were in court merely in their capacity as defendant grantees of deeds and assignments whose validity was being challenged by the heirs at law. (*Shuman v. Supreme L. K. of H.*, 110 Iowa, 480.) If we had a lawsuit here between heirs at law and it should present a situation where some of them, claiming as heirs at law, desired to waive the privilege, and some of them, likewise as heirs at law, objected to waiving it, the matter might present some difficulty, although this court is rather positively committed against any interpretation of rules of evidence which limits judicial inquiry in the ascertainment of the truth. (*Armstrong v. Street Railway Co.*, 93 Kan. 493, 503, 144 Pac. 847.) These observations are only relevant now, however, as tending to show that the trial court did not err in admitting the evidence of Doctor Bruington's physician on the waiver of his heirs at law.

The judgment is affirmed.