No. 23,524.

MARTHA MAIN, *Appellee*, v. ANNIE YANDELL et al. (AVALENA C. ACHESON et al., *Appellants*, JOHN CASSON, *Appellee*.)

SYLLABUS BY THE COURT.

WILL—*Action to Set Aside—Finding—Testator of Unsound Mind.* The record examined, and the finding of the jury and also of the court that when the will in question was made the testator was of unsound mind, is held to be sustained by the evidence.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed February 11, 1922. Affirmed.

*W. R. Hazen,* and *Otis Allen,* both of Topeka, for the appellants.
*W. E. Atchison,* and *Otis E. Hungate,* both of Topeka, for the appellees.

The opinion of the court was delivered by

WEST, J.: Joseph Casson made his will November 18, 1916, giving his property to his grandchildren born of a, daughter by his second wife. He had previously conveyed his farm of 240 acres to the daughter in whose family he was living during the latter years of his life except when at the Soldiers' Home at Leavenworth. The plaintiff brought this suit to set aside the will on the grounds of undue influence and mental incapacity. The court eliminated the first ground and submitted to the jury the question, "Was Joseph Casson of sound mind and memory, as that expression is defined in the instructions given by the court, on the date of the execution of the will?"—to, which the jury answered "No." The court also made a finding that—

"Joseph Casson, deceased, was of unsound mind at the time of the execution of the will . . . and the court hereby approves said finding of the jury and adopts same as his own, and hereby finds upon the evidence that Joseph Casson was of unsound mind at the time of the execution of said will."

Joseph Casson died February 9, 1917, less than three months after making the will, at the age of eighty-seven. He was a veteran of the Civil War and spent several of his later winters at the Soldiers' Home at Leavenworth, the last time being in 1913. The winter of 1914, he spent at Hot Springs, Ark., and visited the plaintiff, Martha Main, from February to May thereafter on his way home. A number of witnesses who had known him for many years testified to certain peculiar actions and conduct, and that they believed he was of unsound mind.

Joseph Casson appears to have been eccentric, erratic, active, irritable, fond of music, a good singer, given to dancing jigs, an extreme partisan in politics, an active member of the G. A. R. post, and a man whose peculiarities would naturally attract attention, but he was active in business and apparently successful until late in life, and seems to have been a man of strong individuality and considerable force. There was evidence that with increasing years he became somewhat careless in his appearance and habits, and his daughter complained that during his visit in 1914, his personal habits were in some respects repulsive.

On the date the will was drawn and executed, his daughter and her husband went with him to the office of his attorney who had done business for him for many years. The daughter testified that he was greatly attached to her children; that when thew went to have the will drawn—

"Mr. Hazen got up, shook hands with papa, and said, 'How do you do, Joe,' and talked some. Papa said he wanted to fix some property. Mr. Hazen asked him what he wanted to do with it. Papa said he wanted to fix it for 'her' little children, referring to me. Mr. Hazen explained to him the different ways but I can't tell them now."

His counsel testified:

"The first I knew of the will transaction, Acheson and his wife and Mr. Casson came into the office. Do not remember of Mr. Casson ever coming into the office assisted by anyone. Never saw him when he could not walk by himself. When Mr. Casson came into my office at the time the will was written, the first thing, of course, was a greeting . . . and we talked awhile until we got down to business; then he said in substance he wanted to dispose of his property to his three grandchildren and wanted to know how it could be done. I have a recollection or impression that in the conversation he used the word 'deed'; but after he told me what he wanted to do, I explained to him he could do it in two ways. The only way he could dispose of it after his death was by will and in his will, he could have a trustee to handle the property if he desired, or he could will it direct to the children. My best recollection, is he asked me if it was willed to the children whether the children could handle it and whether it could be sold. . . . I took a scrap of paper and a pencil and made a memorandum of how Mr. Casson wanted the will made. I then called to the stenographer and she came to the desk where I was; I dictated the will to her and she took it out in the reception room and transcribed it and brought it back. I read it over, as I always do, first, to see if there were any mistakes in the transcribing, and then read it aloud to Mr. Casson and the will was satisfactory, and it was signed. He signed the will himself. No one assisted him.'

"Q. Did either one (Acheson or wife) suggest before the will was drawn

what should go into it? A. I would say not. If they had I wouldn't have written the will. He was the one who told me what he wanted done with his property after his death. . . . He was in my opinion of sound mind."

H. W. Page testified that he had known Joseph Casson about twenty years and had done business for him and against him, and when the will was made witness and Judge Hazen were partners.

"The first I saw of Casson he was coming into the office; his daughter and son-in-law were with him; they had hold of his arm. He was very feeble. They went into Mr. Hazen's private office.

"Q. Did you hear what transpired in the office after they went in there? Ans. I heard but didn't pay any attention, so that I could not repeat what was said. . . . The day was not cold but Mr. Casson had on an overcoat and a long red scarf around his neck and wore a cap.

"Q. Was anything said between Judge Hazen and Mr. Casson in relation to the will? A. Mr. Hazen said to Casson, he said, 'Joe, is that the way you want it?' Mr. Casson was then where I could see him. Our door was partly open. The telephone rang and I was in the act of answering the phone, when Mr. Hazen asked Mr. Casson that, Mr. Casson made no reply. Mr. Casson was crying, tears running down his face.

"Q. Did you hear him say anything about it that time? A. No, sir.

"Q. Did he make any answer to the question? A. No, sir. Mr. Hazen asked him in a loud voice, 'Joe is this the way you want the will?' and without appearing to understand, he said: 'If that's the way these folks want it, I guess it's all right.'"

Mr. Page further testified that it was customary for him to witness wills made in the office, and that the stenographer was not called to witness. "I think we were both there and they had arranged the witnesses to the will." He did not know what Mr. Casson was crying about. He spoke of the "old man appearing not to know where he was that day."

There was considerable evidence by this and other witnesses which would be relevant to the question of undue influence, but the foregoing is the substance of what occurred at the time of the execution of the will.

In support of the motion for a new trial, James Acheson made affidavit that he is the father of Harry Acheson and lives on Munson avenue, west of Topeka; that he was well acquainted with Joseph Casson; that in November, 1916, Joseph Casson, Harry Acheson and Lena, his wife, stopped at affiant's home and visited there some time before going on; that while they were there affiant had quite a conversation with Joseph Casson in which the latter said—

"He was going to town to fix things up that day so that there would be no trouble about his property after he was called away, and that later they all, said Joseph Casson, Harry Acheson and wife, went away together. Later said Harry Acheson and wife came back to affiant's home with said Joseph Casson and left him there while they went back to the city to do some shopping. That during the absence of said Acheson and wife, Joseph Casson ate supper with affiant and affiant had a long conversation with him before Harry Acheson and wife returned. In said conversation, said Joseph Casson stated that he had made his will in favor of the Acheson children; he said some of his children had misused him and they should get none of his property. He did not say anything against his daughter Mrs. Yandell, but said her husband was a drinking man and that he should not have a chance to spend any of his (Casson's) property for booze. He mentioned his son John Casson and his daughter Mrs. Main as the ones who had misused and defrauded him; he was in good spirits and appeared to be pleased that he had things now fixed as he desired."

Doctor McDonald testified that certain actions and conduct of Joseph Casson testified to would indicate an unsound mind. Among other things testified to, touching Joseph Casson's actions and mental condition, one witness stated he had known him since 1892, and lived neighbors, and had conversations with him up until his death, and that he did not "think he was really sound in his mind."

"Q. What do you mean by unsound mind? A. When a person is forgetful and don't realize what they are talking about. . . . He met him four or five years ago on his return from the Soldiers' Home and Casson looked at him and said, 'Well, who are you,' . . . Sometimes he conversed intelligently and sometimes he didn't. That he would ramble about his business and troubles."

That on one occasion when Casson had had trouble with his wife he came riding on a horse, and wearing a lady's hat, and did not seem to know what he was talking about.

Robert F. McGill said he had known Joseph Casson for many years and that—

"In the latter part of his life the witness noticed that his mind got worse as he grew older. That he stooped, his hand shaky, and he appeared greatly aged and worn out. That he was getting old and more feeble 'and his mind going as he went.' That the last time he met him, Mr. Casson did not know the witness."

John Hensler had a conversation with him six months before he died and had known him for thirty-eight years.

"He became more feeble and childish and that he didn't know the witness when he met him."

C. E. Bearhs of the Soldiers' Home—called a commander—met Mr. Casson every day while there.

"I observed his physical condition was poor. As to his mental condition, I observed that he would get himself in trouble with the members, arguing questions, getting into heated discussions and debates on politics and religion frequently and I have been called to. go and settle questions and make him hush. . . . He would sometimes get into arguments and act strangely and uncalled for and get into quite heated debates and lose the friendship of the member. He was unreasonable and not rational but cannot recall any specific instance of that kind. After observing his conduct, as I have stated, in my opinion his mind was unsound, basing my opinion on my observation of his conduct and conversation during the months that I knew him, he was not competent to transact business intelligently."

Z. C. Powers was well acquainted with Joseph Casson. As to his mental condition, he said:

"I have stated all I know about that, as I supposed. I noticed that he was not right someway; that there was something wrong with him. No man would go on as he did in his right mind."

Chaplain Payne was in the 2d Illinois Cavalry with the testator and began his duties at the Soldiers' Home in July, 1898. He first became acquainted with him as a singer in the army.

"When he came to the Home he attended our chapel; when he was here he often led the singing as choir master. . . . I remember of his talking about a daughter that lived on, I think, his farm. He had two grandchildren that he showed my wife and I pictures of the grandchildren, and he was always talking of those children and that daughter. I think he told me that he and his wife had separated and she got part of the property and he got part of it and that he lived with his daughter on the farm with the two children. He would visit us every month or two. . . . Well, I realized in some things he was a little childish but if I was going to cheat a man, Joe Casson would have been the last man I would have tried to cheat out of his property. He had mental capacity enough to look after himself."

The jury were told:

"To be of sound mind and memory, it is not necessary that a person should have sufficient capacity to make contracts, to do business generally, or to engage in complex or intricate business matters. . . . In this connection I will say to you that it is not enough in itself to disqualify a person from making a will or to warrant the setting aside of his will, or to warrant a finding that he was not of sound mind and memory, that he may have been odd or eccentric, contentious, radical or quarrelsome. . . . Before a will can be held invalid so far as the question raised in this case is concerned, it must be found that the person was not of sound mind and memory at the time of the making of the will. . . . The question here is not as to what the condition of the mind of Joseph Casson may have been at some time prior to that of the execution of his will or what qualities or characteristics he may have possessed at other times, but your inquiry should be as to his mental capacity at the time of mak-

ing the will, but as stated above, the evidence relating to such matters upon occasions before and after making the will is proper for you to consider and give such weight as you think it entitled to in determining the main question."

The settled rule is that the trial court's finding of facts is conclusive unless such finding is unsupported by the evidence. The testamentary capacity of Joseph Casson was the sole point passed upon by the jury and by the court, both finding against its sufficiency. In *Bruington v. Wagoner*, 100 Kan. 10, 164 Pac. 1057, the trial court found that the testator was mentally incompetent to make a will. Certain evidence was referred to in the opinion and it was then remarked:

"That there was other and contradictory evidence is of no consequence in a court of appeal, which is bound by the trial court's findings of fact so long as there is competent and sufficient evidence which would justify such findings, and in this case there was no trouble on that account." (p. 13.)

Here it is insistently urged that there was no competent evidence to show testamentary incapacity when the will was signed. But there was sufficient to have the actual effect of convincing twelve jurors and an able and experienced judge; and we are unable to say, after a careful searching of the record, that the conclusion reached was unfounded or unjustified. It is needless to use the scalpel of analysis to demonstrate each item tending to show a diseased condition of the testator's mind. Neither would it avail to assert that other triers of fact might reach other conclusions.

The record from which we have quoted affords sufficient evidential basis for the finding reached, and the decree is affirmed.