# JANUARY TERM, 1923.

*PRESENT:*

Hon. WILLIAM A. JOHNSTON, Chief Justice.
Hon. ROUSSEAU A. BURCH,
Hon. HENRY F. MASON,
Hon. JOHN MARSHALL,
Hon. JOHN S. DAWSON,                    } Justices.
Hon. WILLIAM W. HARVEY,
Hon. RICHARD J. HOPKINS,

No. 23,069.

Sarah E. Craig, *Appellee,* v. S. J. Craig, *Appellant.*

No. 23,904.

*In re* The Estate of Sarah E. Morse, *alias* Sarah E. Craig, Deceased, W. S. Langmade, as Executor, et al., *Appellees,* v. S. J. Craig, *Appellant.*

SYLLABUS BY THE COURT.

1. Judgment of This Court Procured by Fraud—*Jurisdiction to Set Aside.* Following the decision in the preliminary hearing of this case, 110 Kan. 13, 202 Pac. 594, it is held that the supreme court is possessed with inherent and statutory power to set aside or correct an order of reversal of a case procured by the fraud of one of the litigants, notwithstanding the mandate has been spread in the district court and the cause there dismissed. This court has like power to prescribe a rule of procedure for setting aside or correcting such an order.

2. Same—*Proper Procedure by Motion and Process.* Following the decision on the preliminary hearing, *held,* the proper procedure is by motion to set aside the order, upon personal service to the litigant charged with the fraud and notice of the time of hearing.

3. Divorce—*Judgment—Death of Party Pending Appeal—Property Rights Not Abated.* Following the former decision, 110 Kan. 13, 202 Pac. 594, and cases cited in that opinion, *held,* that "the death of a party to an action for divorce, pending its appeal, abates the action on appeal so far as it affects the marital status, but it does not necessarily abate the action or appeal so far as property rights are concerned."

4. Same—*Parties to Proceedings to Vacate an Order of Reversal Procured by Fraud.* Shortly after the decree of divorce was entered in the district court, the former wife of appellant executed a last will and testament devising her property to numerous relatives and naming an executor. *Held,* following

*Craig v. Craig,* supra, that the devisees and the executor are proper parties to institute proceedings to vacate the order of reversal.

5. SAME—*Report of Commissioner Appointed to Take Testimony Approved —Order of Reversal Set Aside.* The testimony taken before a commissioner appointed by the court is examined, and his findings adopted, and, *held,* that the stipulation for reversal of the judgment in the divorce case was obtained by the fraud of appellant; that at the time the appellee signed the stipulation she was of unsound mind; that she was suffering from paranoia, and that her action in signing the stipulation was caused by the persistent persuasions and importunities of appellant; and the order of reversal is set aside and the appeal reinstated.

6. DIVORCE—*Evidence Sustains Charge of Extreme Cruelty.* The ground upon which the trial court granted the divorce was extreme cruelty of the husband. The evidence is examined, and *held* sufficient to sustain the judgment of the trial court, notwithstanding the evidence as to some of the charges of cruelty was uncorroborated except by circumstances.

7. SAME—*Distribution of Property Approved.* The court restored to the wife the real property owned by her at the time of the marriage and allowed her to retain certain cash and liberty bonds belonging to her. *Held,* that as there was nothing in the evidence to show that any part of the personal property was the joint savings and earnings of the husband and wife, it was not error to refuse to make a division of the personal property.

8. WILL—*Order of Probate Court Establishing a Last or Destroyed Will Valid.* Following the reversal of the judgment for divorce and the dismissal of that action in the district court, the former wife of appellant executed a will revoking her former will and leaving her property to be disposed of under the statute of descents and distributions. At the same time she destroyed the former will. The devisees named in the destroyed will brought proceedings in the probate court to establish and probate the destroyed will, alleging that it had been fraudulently and involuntarily destroyed between January 22, 1921, and the death of the testatrix, which occurred on April 17, 1921, and that the testatrix was throughout this period mentally incapable of making or revoking a will. The probate court made an order establishing the will and probating it. An appeal to the district court resulted in a judgment establishing the contents of the destroyed will and ordering it probated. The contention of appellant that because of sections 50 and 53 of the statute of wills, it was necessary for the proponents to show that the will was lost or destroyed subsequent to the death of the testatrix, considered and *held* to be without merit and that the courts have power to establish a will lost or destroyed before the death of a testator without a statute expressly authorizing the establishment of such a will, and *further held,* that by reason of the judgment of divorce, the former husband, appellant, has no standing to object to the probate of the will or to prosecute the appeal.

Appeals from Rawlins district court; WILLARD SIMMONS, judge. Opinion filed January 6, 1923. Case No. 23,069. Petition to vacate order of reversal allowed. Case No. 23,904 affirmed.

*Dempster Scott, Charley E. Scott,* both of Atwood, *E. H. Benson,* of Colby, *W. H. Cowles,* and *J. M. Stark,* both of Topeka, for the appellant.

*C. A. P. Falconer, E. E. Howard,* both of Atwood, *W. S. Langmade,* of Oberlin, *Frank Doster,* and *J. E. Addington,* both of Topeka, for the appellees.

The opinion of the court was delivered by

PORTER, J.: These two cases have been argued and submitted together. One is an appeal in a divorce case, the other is an appeal in a will case wherein the district court established a destroyed will and ordered it duly probated. There is involved also the final disposition of a special proceeding by motion to set aside an order which this court entered reversing the judgment in the divorce case upon a stipulation of the parties which it is alleged was procured by the fraud of the appellant. This motion must be disposed of first.

### MOTION TO VACATE.

The motion to set aside the order of reversal charged that Sarah E. Craig obtained a judgment of divorce in the district court of Rawlins county from her husband, S. J. Craig, on the ground of extreme cruelty; that he appealed from the judgment and the case was set for trial here on February 11, 1921; that in the meantime Mrs. Craig became insane and was in a private hospital; that appellant lured her from the hospital and induced her to sign a stipulation upon which the court acted in reversing the judgment; that following the spreading of the mandate of this court in the district court, the appellant also induced Mrs. Craig to destroy a will that she had made subsequent to the divorce by which she devised her property to certain relatives and kinsfolk and that shortly thereafter she died. The devisees under the will, together with the executor named therein, are the moving parties in the special proceedings in this court to set aside the order of reversal.

On the preliminary hearing of the motion it was held that this court has both inherent and statutory power to prescribe a rule of procedure for setting aside and correcting an order here procured by the fraud of one of the litigants. The procedure approved was by motion to set aside the order upon personal service of the motion and due notice of the time for hearing served upon the litigant charged with the fraud.

In the opinion it was held that the devisees under the will of Mrs. Craig, the successors to her estate, and her executor were proper parties to attack the order of reversal procured by appellant's

fraud. It was also held that "the death of a party to an action for divorce pending its appeal abates the action on appeal so far as it affects the marital status, but it does not necessarily abate the action or appeal so far as property rights are concerned." (*Craig v. Craig,* 110 Kan. 13, syl. ¶ 5, 202 Pac. 594.)

The court appointed the Honorable R. M. Pickler, commissioner to take testimony on the matters alleged in the motion, and report his findings of fact thereon. The special proceeding now comes before the court upon the report of the commissioner.

Before considering the evidence and the finding of the commissioner, it should be said that the appellant in his brief reargues the question of the jurisdiction of this court to entertain the proceedings to vacate the order of reversal. That matter was gone into quite thoroughly in the opinion on the preliminary hearing of the motion, and the court is well satisfied with the conclusions reached at the time and the declarations of law as there announced.

The following is a summary of the more important findings of the commissioner:

Sarah E. Craig, plaintiff in the divorce action, was married to the appellant, S. J. Craig, on October 2, 1916. She had been a widow since December 30, 1915, and had been twice married before, living happily with her second husband, Morse, for about forty years. At the time of his death they had property of the value of about $44,000, a part of which consisted of a section of land in Rawlins county. This property belonged to Mrs. Morse at the time of her marriage to Craig. Craig owned about $600 worth of property. At the time of her marriage to Craig he was 12 years younger than she. Their marriage resulted unhappily. She left home three times: in September, 1917, in April 1919, and again in September, 1919; each time claiming it was on account of abuse and indignities by the appellant. She sued for divorce in September, 1919. On the trial she testified to acts of cruelty on the part of her husband (not necessary to detail here), among other things, that he uttered slanderous words about Morse, her former husband; tried to prevent her visiting with her neighbors until she finally refrained from doing so; threatened to beat her until her neighbors would not know her; made attempts to take her life by the use of chloroform; accused her of "whoring" around with certain persons he mentioned.

The decree of divorce was granted on March 27, 1920. Mrs. Craig was given her own property and the defendant barred from all claim thereto. Craig appealed the case. The brief of Langmade and Howard, attorneys for Mrs. Craig, was filed January 27, 1921. The case was assigned for hearing February 11, 1921. On April 17, 1920, a few weeks after the decree of divorce, Mrs. Craig executed an instrument intended to be her last will and testament, making various devises of her property to the persons who are petitioners in the proceedings to vacate. The instrument was prepared by Judge W. S.

Langmade, her attorney, and written by Earl E. Howard. About November 1, 1920, Dempster Scott and Charles Scott, of Atwood, attorneys for Mr. Craig, prepared a stipulation for the reversal of the appeal in the divorce case. During the latter part of November, 1920, Mrs. Craig was at the home of Mrs. Messmaker. Judge Langmade called on her and took her to the farm where Mr. Craig lived. She talked with Craig while Judge Langmade left them alone for about ten minutes, when Craig came and showed him the stipulation for reversal.

On January 18, 1921, the stipulation for the reversal was signed by Mrs. Craig, and on the same day she notified Langmade and Howard by letter that she no longer desired their services in the case pending in the supreme court. February 7, 1921, W. H. Cowles, of Topeka, attorney for appellant, prepared a motion to be signed by her to strike from the' files the brief of her attorneys in the divorce case and for reversal and dismissal of the action. Mr. Cowles mailed the instrument to S. J. Craig, and on February 10 Mrs. Craig signed it and swore to it before a notary public procured by S. J. Craig, and the motion was then mailed by S. J. Craig to the clerk of the supreme court. On February 11, the stipulation for reversal was filed in the supreme court by W. H. Cowles, attorney for appellant, and on February 11, the motion was allowed and the order entered reversing the case and dismissing the appeal. No one appeared for the appellee when the order was made. On March 21, 1921, the mandate of the supreme court was spread on the records of the district court of Rawlins county and the action was dismissed.

The affidavit already mentioned prepared by Mr. Cowles at Topeka after an interview with Mr. Craig, and which Craig induced his former wife to swear to before the notary, stated the names of a half dozen or more relatives and neighbors of Mrs. Craig, and charged that they had induced her to institute the divorce proceedings. The commissioner finds that Mr. Cowles left the names of the parties blank in the form of the affidavit he prepared; that when they went before the notary Mrs. Craig suggested some of the names and S. J. Craig suggested others. The commissioner finds there was no evidence upon which to rest the charge contained in the affidavit and there was no evidence of any attempt upon the part of any of the relatives of Mrs. Craig to injure or abuse her. On the day the action was dismissed in the district court Mrs. Craig was in attendance, accompanied by Mr. Craig. She was not in the court room when the divorce case was called, and the court inquired whether anyone was representing her. Judge Langmade was in the room and was asked whether he represented her. He stated that he had been an attorney in the case, but had been given to understand that his services would be no longer required; that he was not acquainted with the circumstances attending the proposed dismissal, but supposed it was all right so far as he knew. The journal entry dismissing the action was, at the suggestion of Mr. Cowles, approved by Mrs. Craig.

On February 20, 1921, after the dismissal of the divorce case, Herbert Howland, attorney of Rawlins county, was called to the place where the appellant and appellee were living to draw a will. On this occasion Mrs. Craig carried on conversation with Howland which he deemed visionary. She seemed to be in fear of her neighbors and wanted them arrested. She named

Craig v. Craig.

individuals who Mr. Howland said he knew personally were not making any trouble for her. When the will was being drawn, Mr. Craig made some suggestions and Howland made some. In discussing the will Mrs. Craig was sometimes prompted by Mr. Craig and by Mr. Guard, one of the witnesses to the instrument. The attorney, Howland, did not then believe Mrs. Craig to be of sound mind. Her talk at the time was disconnected and she would forget what she was talking about. Noting her condition, he drew a part of a will and told her she would better wait until she came to town. When the will was executed, Mr. Howland thought that if it were contested it would not stand; he regarded it merely as something to pacify her until she could get to town.

During Mrs. Craig's visit in Kentucky she became very ill. When she had recovered sufficiently to travel, she returned in August, 1920, she was in a weak and feeble condition on the journey as well as after her arrival. She lived for brief intervals with different relatives after her return; failed to improve mentally or physically, and on December 27, 1920, she was received as a patient for treatment at the Henneberger Hospital at Atwood, where she remained until January 22, when she left under the circumstances hereafter related. Persons who had formerly known her observed a marked change in her immediately upon her return from Kentucky. Her mind appeared to be unstable, she would start to tell something and change to something else; was constantly talking about her divorced husband; said she was afraid of him; she feared to have him come upon the place for fear he would kill her; she did not appear to be able to concentrate her mind or think connectedly; said to one witness "I want someone to look after my threshing." He agreed to attend to it; she then spoke of getting someone else, and later of going over to attend to it herself; had a fainting spell in November, 1920; was sick for several days, unable to get around without assistance. At one time she would say that if Craig would be good to her she would like to have him back, and in a short time would say that all he wanted was her money. While at the hospital she told others that Craig wanted her to sign a paper and that she was afraid to do so and was afraid of him; that he wanted her to leave the hospital and go to a hotel and let him get another doctor; that he asked after her every day and she was afraid that he would take her away. She imagined that he had sent her candy that was poisoned and suggested that some of it be given to the nurse to find out what effect it would have. When she entered the hospital in December she had bronchitis, a cough, irregular heart, was laboring under false impressions and hallucinations. When she first went to the hospital she told Dr. Henneberger she was afraid of Mr. Craig and did not want to see him. Instructions were given to the nurses not to admit him. In ten days or two weeks afterwards it was found she was receiving notes and letters from him. The doctor testified that after receiving one of the letters she told him that Craig wanted to marry her. She seemed as excited over it as a girl of sixteen. She changed her mind within the space of a day or two, and shortly before she left the hospital requested that Craig be permitted to see her. The doctor refused to permit this until after one of Craig's attorneys had called him up on the telephone several times and insisted that Craig should be admitted. When he was admitted she seemed still to fear to

see him. But after he commenced visiting her, this fear subsided and she was then anxious for him to visit her.

The commissioner gave special weight to the evidence of Dr. Henneberger, on the ground that he appeared to have fair training and means of observation of mental ailments and because he had Mrs. Craig's condition continuously under his personal observation during the time she was in the hospital, from December 27 to January 18, 1921, and also had some knowledge of her before she was received for treatment at the hospital. Dr. Henneberger testified that Mrs. Craig seemed to be in constant fear and had delusions of being persecuted; that her mental condition was not normal; she was suffering from paranoia, a form of mental disease known as delusional insanity; the technical form of delusional insanity known as monomania. According to the doctor she had no lucid intervals and at all times seemed subservient to the will of others, easily influenced. When she left the hospital she had not been discharged; she went away in the company of Mr. Craig on the pretense of merely taking a ride, but the doctor afterwards discovered that it was a plan to get her away, and she did not come back.

The commissioner finds that the matters testified to by Dr. Henneberger are so borne out and supported by the other findings and circumstances that they should and were found to be facts.

About March 1, 1921, Mrs. Craig destroyed the will executed by her on the 17th day of April, 1920, which is referred to in the evidence and findings as the "Langmade will"; she also destroyed at the same time the will drawn up by Howland on the 20th day of February, 1921; but after her death, which occurred on the 17th day of April, 1921, an impression copy of the Langmade will, preserved by the scrivener, was obtained, and proceedings were had in the probate court resulting in this will being admitted to probate notwithstanding the destruction of the original instrument.

The commissioner finds that from the time she was taken from the hospital and for about one week before she was so taken away by S. J. Craig, Mrs. Craig was under his domination, all fear of persecution at his hands had passed, and in her mind had been transferred to those whom she now considered as enemies. She was then claiming that there never would have been any trouble between her and Mr. Craig if it had not been for the meddling of her relatives, and she became possessed with the belief that there was some kind of fraud and conspiracy between her relatives and neighbors to keep her and Mr. Craig apart; that her relatives and neighbors, not Mr. Craig, were after her money.

The commissioner finds that Craig had opportunities of influencing Mrs. Craig, and that there was weighty evidence to substantiate the charge that he had exercised this influence, referring particularly to his persistence in seeking her at the hospital; his insistence and perseverance in the face of a refusal to admit him; the action of his attorneys, who took the matter up with Dr. Henneberger in his behalf; his appearing later with the stipulation which he wanted to have her sign; getting her out of the hospital under the pretense of taking her for a ride, and her ready acquiescence; the preparation and procuring of the form of an affidavit in which she names the neighbors, who, in her derangement, she imagines are plotting against her; Craig's

Craig v. Craig.

suggestion of names to be inserted in it; his suggestions made at the time of the drawing of the Howland will on February 20, 1921; his keeping in his possession the blank form of the stipulation for reversal of the appealed case from November 1 to January 18, when through his persistence she signed it; the letter of his attorney giving him directions about the contemplated destruction of the first will, in which the attorney directs him "to let her do this herself." These and other circumstances, the commissioner held, tended to prove that he was not only cognizant of his power to mold her mind to his will but he exerted it as opportunity afforded.

The commissioner finds that after her illness in Kentucky her health was impaired and her mentality affected; she was not capable of connected thought or of transacting business; was of unsound mind, easily influenced and swayed by anyone with whom she would converse; with any friend with whom she would talk; that she was affected with paranoia which progressed until its symptoms were apparent to Dr. Henneberger and its ravages were observable in her disordered mentality; that on February 20, 1921, when she executed the Howland will, and when on about March 1, 1921, she destroyed the Langmade will, made a year before, and destroyed the Howland will, she was of unsound mind, suffering from delusions, and had not sufficient conception of the matters and events as they transpired to realize their gravity or probable consequence; that she was influenced by such delusions and by the influence and persuasions unduly exercised upon her by S. J. Craig which had the effect of substituting his will for hers. The commissioner finds that when she signed the stipulation for dismissal of the appeal in the divorce case she was not capable of sound reason or fair or rational deliberations, but was of weak and unsound mind; was suffering from paranoia, and that her action in signing it was caused by the persistent persuasions and importunities on the part of S. J. Craig, which, under the circumstances went beyond reasonable and legitimate solicitation.

The commissioner also finds that the will of February, 1921, known as the Howland will, and the stipulation for reversal were neither of them signed nor executed by Sarah E. Craig during a lucid interval.

. We have carefully examined the testimony taken before the commissioner, the numerous letters, communications and instruments set forth in the record, and adopt the findings of the commissioner. So far as the findings, therefore, bear upon the motion to vacate, it follows that there is only one thing for the court to do, and that is, to set aside the order of reversal and dispose of the divorce case on its merits.

### THE DIVORCE CASE.

The divorce case was heard before the Honorable Charles I. Sparks, called in from the adjoining district because the regular judge, Honorable C. A. P. Falconer, disqualified himself from sitting. Judge Sparks held generally that the allegations of Mrs. Craig's petition charging extreme cruelty were true. The main

ground for the appeal is that the evidence was insufficient to sustain the charges because Mrs. Craig's testimony was wholly uncorroborated. Some of the indignities and abuses charged were of a nature that made it impossible to produce a corroborating witness. The course of the trial took a wide range and many witnesses testified. The appellant was a witness and the court heard his denial of the various charges. Besides, there were some circumstances in the evidence which tended to corroborate plaintiff's testimony.

It must be assumed that the evidence was sufficient to convince the judgment and satisfy the conscience of the able district judge who presided at the trial. It is unnecessary to cite decisions that under these circumstances this court is bound by the findings of the trial court.

There is a complaint that the court gave the plaintiff all the real property owned at the time of her marriage and also allowed her to retain all the cash and liberty bonds she had, "a considerable part of which was the savings of the joint efforts of the plaintiff and defendant." There is nothing in the evidence to show that any part of this personal property was the joint earnings or savings of the husband and wife. There was some evidence tending to show that none of it was. In addition to the property appellant possessed at the time of the marriage, the court permitted him to retain his rights under a lease on Mrs. Craig's farm which included his two-thirds interest in 420 acres of wheat, then growing on the land.

The judgment of divorce is affirmed.

### THE WILL CASE.

The action was an appeal to the district court from the order of the probate court of Rawlins county admitting to probate the will of Sarah E. Morse (formerly Sarah E. Craig) and appointing W. S. Langmade, executor. The trial in this case was before Honorable Willard Simmons, regular judge of the district.

The petition alleged that the will to be probated was fraudulently and involuntarily destroyed between January 22, 1921, and April 17, 1921, the date of the death of Sarah E. Morse; and that the testatrix was throughout this period mentally incapable of revoking the will. Probate was opposed by Craig and he filed a motion to deny probate on the ground that the petition itself showed the will not subject to probate under our statute. He relies upon the provisions of the statute of wills (§§ 50, 53; Gen. Stat. 1915, §§ 11801,

11803) which provide for the establishment of the contents and the probate of a will duly executed and unrevoked at the time of the death of the testator and which has been lost, spoliated or destroyed subsequently to the death of such testator. He contends that it was necessary for the proponents of the will to show that it was duly executed, never revoked, and that it was lost or destroyed subsequent to the death of the testatrix and of course to establish substantially the contents of the will.

The appellee cites Schouler on Wills, 5th ed., § 385, to the effect that: No revocation can be good which is procured by fraud or palpable error, or where the testator was unduly influenced to commit the act; and it is clearly settled that the revocation of a will, while the testator is insane, is no less void than the making of a will; because it requires the same capacity to revoke a will as to make one, and one cannot intend to destroy, in a legal sense, unless his mind acts rationally and to the point.

And see, *Barnes v. Brownlee,* 97 Kan. 517, 155 Pac. 962, where it was contended that a will made in Texas was not effective because it was not in existence when the testatrix died. In the opinion it was said:

"The destruction of a will to which she did not consent, whether done accidentally or fraudulently, does not operate as a revocation of a will in the absence of a statute providing that to be the effect. A will may be established and proved that a testator during his last illness was fraudulently induced to destroy, through fear or for any other cause unduly exercised so as to take away his free and voluntary mind and capacity to act. *Batton et al. v. Watson,* 13 Ga. 63." (p. 520.)

Other cases cited by the appellees are to the effect that a will destroyed prior to the testator's death does not affect the jurisdiction of the court to admit it to probate when proved by copy, if it remained unrevoked. *Thompson, Appellant,* 114 Maine, 338, and see, also, *Matter of Goldsticker,* 192 N. Y. 35; 18 L. R. A., n. s., 99, and notes to the effect that one lacking testamentary capacity is not competent by means of an attempted testamentary act to revoke a prior will.

There was no error in permitting W. S. Langmade who drew the will and Dr. Henneberger who treated Mrs. Morse for physical ailments to testify in regard to statements made by her. It has been repeatedly held that a lawyer who drew the will is competent to testify both as to conversations between himself and the testator at

the time and also to the mental condition of the testator. (*Durant v. Whitcher*, 97 Kan. 603, 156 Pac. 739, and cases cited in the opinion.)

The objection to the testimony of the physician is one that may be waived by the heirs in a contest with strangers to the estate. (*Fish v. Poorman*, 85 Kan. 237, 116 Pac. 898; *Bruington v. Wagoner*, 100 Kan. 10, 164 Pac. 1057.) Even in a case between heirs at law, where some consent and others object to waiving the privilege, it has been intimated that in such a situation this court would probably hold "against any interpretation of rules of evidence which limits judicial inquiry in the ascertainment of truth." (*Bruington v. Wagoner*, supra, p. 16.)

This disposes of the principal contentions of the appellant. More attention would be paid to them were it not for the fact that by reason of the decision in the divorce case, he has no standing to raise objections to the probate of the will or, in fact, to prosecute this appeal.

The judgment in the will case is therefore affirmed.