No. 24,609.

JAMES A. MOORE, *Appellant*, v. THE PEOPLES STATE BANK OF WHITE WATER, and G. B. HANSTINE, *Appellees*:

SYLLABUS BY THE COURT.

ESCROW—*Alleged Unauthorized Surrender of Oil and Gas Lease—Authority Shown—Ratification Proven—Instructions.* In an action against an escrow holder for alleged unauthorized surrender of an oil and gas royalty assignment, the evidence examined and *held* sufficient to maintain a defense that the surrender was authorized, and also that it was ratified; and *held* also that no prejudice to plaintiff resulted from an instruction to the jury, not erroneous in itself nor inconsistent with the other instructions, on one feature of the case which probably should have been ruled on as a matter of law.

Moore v. State Bank.

Appeal from Butler district court; Allison T. Ayres, judge. Opinion filed July 7, 1923. Affirmed.

*R. L. Holmes, C. G. Yankey, W. E. Holmes, D. W. Eaton,* and *John L. Gleason,* all of Wichita, for the appellant.

*H. W. Schumacher, T. A. Kramer, George J. Benson,* and *J. B. McKay,* all of El Dorado, for the appellees.

The opinion of the court was delivered by

Dawson, J.: This was an action for damages for the alleged unauthorized surrender of an assignment of an interest in a gas and oil royalty which plaintiff had deposited in escrow with the defendants.

The plaintiff, James A. Moore, sold a half interest in his gas and oil rights as owner of 40 acres of Butler county land to two promoters, Stromquist and Eythman, for $25,000, to be paid as follows: $4,000 cash, $11,000 in 30 days and $10,000 in 60 days. The plaintiff executed an assignment of this half interest and deposited it with the defendants, the Peoples State Bank of White Water, and G. B. Hanstine, the bank's cashier and managing officer. Hanstine had been plaintiff's trusted banker for ten years. Hanstine was fully advised of the terms of the escrow agreement. The promoters made timely payment of the first and second sums due; and about that time plaintiff who was ailing went to Hot Springs, Ark., for his health. Before going, the promoters had been to see him concerning a similar assignment on another 40 acres of plaintiff's land, and Hanstine seems to have been advised of it. The promoters had intimated to plaintiff that they might need more time to pay their obligations to him. Shortly thereafter the promoters called on Hanstine and requested him to see plaintiff about getting an extension of time, and informed him that plaintiff had gone to Arkansas. Hanstine told them that he would write plaintiff as soon as he learned his address. About that time, Hanstine received a letter from plaintiff, which, eliminating personal matters, reads:

"July 22, 1919.
Hot Springs, Ark.

*"Mr. Hanstein, White Water, Kansas.*
"Dear Sir:—  . . .

"The Royalty men were up to see me before I came away and talked like they couldn't take only the one forty. Unless we gave them more time on the other $15,000. What do you think ought to be done. Give them more time if they will pay down about $5,000 or let it go the way the papers stand?

"We may need a little more money. So send us a hundred dollars by draft, or some other way just as good.  . . .

"We may be here 4 or 5 weeks yet.

Yours truly,            J. A. Moore."

On receipt of this letter Hanstine sent the requested draft and wrote that one of the promoters, Eythman, had been to see him and stated that owing to business conditions (resulting from the drilling of dry holes in the neighborhood) he could not sell more units or prospect shares of oil stock and that he and his partner would need more time to find a market for them and that they could put up some security. This letter was mailed, and either that day or the next, Eythman called again on Hanstine and requested him to write again and ask plaintiff if he (Eythman) could have the deed (assignment) to the land, because it was impossible to sell any more units, and to find a market outside the local community it would be necessary to have a permit from the blue-sky board, and that the blue-sky board would not grant a permit unless they had a deed. Eythman also informed Hanstine that the blue-sky board had stopped them from selling. Hanstine testified that he laid this situation before plaintiff in a letter which he mailed within a day or so after his first letter to plaintiff. In response to the first letter from Hanstine (and perhaps to both letters—but that was sharply disputed), the plaintiff wrote—

"HOT SPRINGS, ARK., July 28, 1919.

"*Peoples State Bank, White Water, Kansas.*

"DEAR SIR:—

"Received your letters and was glad to hear from you. Got the draft cashed all right. . . .

"In regard to the royalty. You go ahead and do what you think is best, and give the boys a chance to pay out if they are willing to put up the security.

"Do you know whether they have syndicated the two forties together or just the west one?

"It seems to me they ought to pay interest on that money from the time it is due until it is paid.

"Do as you think best and get the best results possible, and it will be alright with me. Sincerely, J. A. MOORE."

Pursuant to this letter, Hanstine surrendered the assignment to the promoters, taking such security as they could give, which was mostly worthless notes given to the promoters for the sale of units or shares in gas and oil prospects. Hanstine in time did collect $200 on these notes, which was deposited to plaintiff's account and checked out by him.

This action followed. Plaintiff claimed damages in the sum of $10,000 for alleged wrongful surrender of the assignment. Defendants pleaded specific authorization by plaintiff's letter of July 28, and also ratification. In support of the latter point, Hanstine testi-

Moore v. State Bank.

fied that when plaintiff returned from Hot Springs he gave him full information as to what he had done, and that plaintiff made no objection, and that plaintiff had accepted the $200 collected out of the collateral put up by the promoters. Of course plaintiff denied most of this, but his own testimony lends some color of truth to it:

"After we got back from Arkansas and had been home a few days I saw Mr. Hanstine. He said he had turned the contract and deed over to Stromquist and Eythman. I said, 'What did you do that for?' and he said, 'So they could sell the royalty.' I don't remember anything further said at that time. I think that conversation occurred the first time I was in Whitewater after I got back from Arkansas.

"I think I talked with Mr. Hanstine before I bought a farm on the 15th or 16th of September. The farm I bought is the place on which I am now living. At that time I had a conversation with Mr. Hanstine. I bought the farm from a Mr. Golden. I told him I would not buy the farm until I could see Hanstine and see whether I would get that ten thousand dollars. . . .

"After that conversation with Mr. Golden we went into Whitewater and saw Mr. Hanstine and I asked him if he thought I would get that money and he said he thought I would as we had security for it. He told me he had eight thousand dollars of good notes. He did not show me the notes and I don't know whether he told me where he got them. When these notes were due I went to see Mr. Hanstine and asked him how he was getting along and he said there has been but one note paid and that was two hundred dollars; that he had written several letters to the others and some of them had come back unopened, and he said that he guessed he had the wrong addresses.

"After that conversation I went in to see Mr. Hanstine again after the notes were due and asked him if he couldn't turn them over to me; that he had not collected them and I would see what I could do with them, and he said that he had already turned them over to Stromquist and Eythman a long time ago. I said, 'Why did you do that?' and he said, 'To keep them fellows out of the penitentiary.' I suppose he had turned the notes over to the parties he got them from. He did not deliver to me. I never received the balance of this ten thousand dollars or any part of it except the two hundred dollars. That was paid in to Mr. Hanstine and he gave me credit for it in my bank account. . . .

"I don't remember of receiving two letters from Mr. Hanstine, I don't remember of receiving but the one letter. . . .

"After I came home from Arkansas Hanstine told me that he had delivered the assignment to Stromquist and Eythman and that he had taken some notes. He afterwards told me that he had collected two hundred dollars on one of the notes. I knew it was on my bank book and I drew the two hundred dollars and used it. I knew that was two hundred dollars paid on the royalties and I think I knew at that time that the assignment had been delivered to Stromquist and Eythman."

Other features of the evidence need not be detailed, further than to note that the drilling of dry holes in the neighborhood of the land

rendered the lease and royalty of no value, and that by some means the bank got back the assignment, cleared the record of it, and tendered it to plaintiff.

Hanstine's personal demurrer to plaintiff's evidence was sustained, and the jury rendered a verdict in favor of the defendant bank. Judgment was entered thereon, and plaintiff appeals.

This case made rather an interesting lawsuit until the jury rendering its verdict; but from that point onward, there was practically nothing to fight about, and very little indeed to justify an appeal. (*Bruington v. Wagoner,* 100 Kan. 439, 164 Pac. 1057.) It is now urged that the "s" in the word "letters" in the first line of plaintiff's letter of July 28 is an obvious forgery. We cannot say whether it is or not. No such suggestion was made in the court below. The record shows that plaintiff's son, who wrote the letter at his father's dictation and who was a witness in his behalf, testified:

"Q. You say you wrote that letter at your father's dictation and sent it to the bank? A. Yes, sir.

"Q. I call your attention to the fact that it says 'Dear Sir: Received your letters.' Why did you write the word 'letters' if you only received one letter? A. The way it looks to me the 'S' is crossed out by a line.

"Q. That is the way you think about it? A. Yes, sir.

"Q. That is the way you wrote it? A. Certainly must have been.

"Q. You wrote it just that way? A. Yes, sir. . . .

"Q. Why did you write it if you know it was wrong? A. Well, from the suggestion—him saying 'letters,' I had the word written before I noticed it.

"Q. You say you struck it out? A. Absolutely.

"Q. You remember of striking it out? A. It is right there.

"Q. Do you remember of striking it out? A. No, sir; no more than I would remember writing the 'L' in the same letter."

It was sharply contested in the trial court whether Hanstine had written one letter or two. Plaintiff swore he never received but one. It will be observed, however, that the broad language of the letter of July 28 is justly susceptible of an interpretation of a much broader grant of authority to the defendant bank and its cashier to act in plaintiff's behalf than merely to give the promoters an extension of time to pay. Indeed, if plaintiff had prevailed, it might have been a serious question whether the trial court should not have ruled as a matter of law that the letter did confer upon the defendants general authority and discretionary power to act in plaintiff's behalf. "You go ahead and do as you think best. . . . Do as you think best and get the best results possible, and it will be

all right with me." It is difficult to imagine what broader powers the plaintiff could have conferred on defendants to handle this matter in his behalf. So it was not altogether indispensable to the defense of this case that the second letter should have been written or received. However, the trial court submitted the matter to the jury under proper instructions. One of these is criticized on the theory that it was inconsistent with the others. It reads:

"9. It is not necessary that defendant should have written a letter to the plaintiff stating in substance that Stromquist and Eythman desired the delivery of the royalty deed without the payment of the $10,000 in order for such authority to be conferred in the letter dated July 28, 1919, but if under the circumstances a reasonable man would have understood from the letter of July 28, that such authority was conferred, then defendant was justified in believing and acting upon such authority even though he may have written no letter that suggested or asked for such authority."

The only possible fault with this instruction, if any, was not its inconsistency with the others nor because it was erroneous in itself, but because the defendant's rights were thus left to the possible whim or caprice of a jury when such interpretation of the plaintiff's letter should possibly have been given by the court itself as a matter of law. If so, however, the jury interpreted it as the trial court should have done, and as we think it ought to be interpreted, and the result was correct.

Affirmed.