## In re Estate of John Swain.

Margaret Dalton et al., Appellees, v. Patrick Swain et al.,
Appellants.

**WILLS:** Abnormal Nature of Testator.  Prima-facie incapacity to
execute a will is established by testimony tending to show:
1. That testator was an inebriate.
2. That he practiced indescribably filthy and immoral habits.
3. That he was of violent passions, and devoid of self-control.
4. That he was quarrelsome, abusive, and profane.
5. That such conditions indicate mental decay.

**WILLS:** Intoxication and Mental Competency.  Testimony insuffi-
cient to show that testator was drunk at the time of the execu-
tion of a will may still remain in the record for its bearing on
the general issue of mental competency.

**WITNESSES:** Will Contest—Testator's Physician as Witness.  Phy-
sicians may testify to knowledge acquired by them while treat-
ing testator during his lifetime, even though called by con-
testant.

*Appeal from Plymouth District Court.*—W. D. Boies,
Judge.

November 11, 1919.

Rehearing Denied May 17, 1920.

John Swain, a resident of Plymouth County, Iowa,
died, April 27, 1917.  Shortly after his death, a written in-
strument purporting to be the last will and testament of
the deceased, was filed for probate by four of his children,
Patrick Swain, Thomas Swain, George Swain, and Ellen
Ackerman.  Others of his children and heirs at law con-
tested the admission of the instrument to probate, on the

ground that, at the date thereof, the deceased was of unsound mind, and that the execution of the alleged will was obtained by undue influence, exercised over the testator by Patrick Swain and others. On trial to a jury, a verdict was returned against the validity of the alleged will. Judgment was entered accordingly, and the proponents appeal. The material facts, so far as reference to them may be necessary, are stated in the opinion.—*Affirmed.*

*T. M. Zink,* for appellants.

*Shull, Gill, Sammis & Stilwill,* for appellees.

WEAVER, J.—John Swain lived to the age of about 87 years. He had been a farmer, during most of his adult life, was thrifty in a financial way, and at his death was the owner of 460 acres of land in Plymouth County. To him and his wife, Charlotte, who survived him, there have been born ,13 children, of whom 9 were living at the date of the will, as were also 6 grandchildren, the heirs of other children, then deceased. On July 26, 1915, when about 85 years of age, John Swain executed the will which is now the subject of contest. It was drawn by experienced counsel, who now represents the proponents, and gives evidence of painstaking care and intelligence in its preparation. By its terms, his five daughters, Margaret, Ellen, Mary, Agnes, and Catherine, his son Martin, and two of his grandchildren, John and Mary, were bequeathed sums of money varying from $400 to $2,750. Of his real estate, he devised to his son Patrick 120 acres, subject to a charge of $6,000 in favor of his estate; to his son George 80 acres, subject to a charge of $2,000; and to his son Thomas another tract, subject to a like charge of $2,000. He also provided for his wife by a devise to her of 160 acres of land, together with the residuum of his estate, after satisfying the provisions above mentioned and the payment of debts and claims properly chargeable against it. In November, he executed a brief

1. WILLS : abnormal nature of testator.

codicil to the will, for the purpose of identifying with more particularity the grandchildren intended to be provided for in that instrument.

On the trial of the contest, the court below withdrew the issue of undue influence from the jury, and submitted for its verdict the one question of the testator's testamentary capacity. As usual in this class of cases, the question thus presented is one of fact, and involves very little difference between counsel as to the fundamental principles of law applicable thereto. The record is very voluminous, filling about 500 closely printed pages; and we shall not attempt to embody it in this opinion, even in outline, except as it may seem necessary to make clear our position in disposing of the appeal. As we have said, the one issue is upon the testamentary capacity of John Swain at the date of the will, and upon this fact the finding of the jury is final, unless we are able to say, as a matter of law, that the verdict is without substantial support in the record, or that we find error to the prejudice of the proponents in the rulings of the court upon questions arising pending the trial.

I.  We first consider whether the contestants' case is so clearly without support in the evidence that the verdict in their favor should be set aside. We have to concede that there is much testimony tending to support and strengthen the usual presumption of mental soundness in the testator, and that, if the case were triable here *de novo,* and the credibility of the witnesses and weight and value of their testimony were matters for our determination, some of us would be strongly inclined to sustain the validity of the will. But the function of the court in law actions is limited to the consideration and correction of alleged errors in the proceedings below, and this does not include the right or authority to correct possible errors of judgment in the jurors, if their verdict has any reasonable basis in the evidence before them.

A careful survey of the entire record convinces us that, upon the pivotal fact, the mental capacity of the testator at the date of the will, there was sufficient evidence upon which

an honest and impartial jury could find with the contestants. Stated only in a brief, general way, and giving the testimony, as we must, the more favorable interpretation of which it is fairly capable in support of the verdict, it is to be said that the jury could find therefrom that John Swain was by nature a man of violent passions and very little self-control; that he was from his youth a user of intoxicants, a habit which increased with age; and that, during the last few years of his life, he was in an almost continual state of intoxication; that, as years grew upon him, he became indescribably filthy in his person, and indulged in practices too indecent and disgusting to be here specified; that, even at the age of 85, he frequented houses of ill fame, consorted with harlots, and contracted syphilis; that he abused and cursed his wife, and called her a whore; was exceedingly profane, angry, and abusive, without cause; that he had attacks of dizziness and pain in the head; that he would weep, without any apparent cause; that he would pound the table and chairs with his fists; that he would, at times, leave the house in cold weather, dressed only in his underclothes, bareheaded and barefooted; that, on the day he executed the will, and on the day before, he drank large quantities of whisky, was sleepless during the night before, and was intoxicated when he left his home to execute the will. There was still other evidence, which we need not repeat, along the familiar lines of proof pursued in cases of this character, having more or less tendency to show advance in senile weakness and mental decay which sometimes mark the progress of old age.

Altogether, we think, as already indicated, that to hold that these things, if believed, are insufficient to take the question of the testator's testamentary capacity to the jury, would be a clear invasion of the province of the jury. We use the words "if believed," because it is within the province of the jury to believe that to which the court, if a trier of facts, might not give any credit. The writer of this opinion, speaking for himself only, would hesitate long to give credit to the story of any son or daughter who comes

into a court of justice and, to secure a larger share of a father's estate, is willing to brand him as a filthy degenerate or an insane beast. We read in the Good Book that, when Noah, far gone in senility and drunkenness, lay helplessly exposed to the scorn and contempt of the passing crowd, his two sons, Shem and Japheth, hearing of his condition, caught up a garment which they carried over their shoulders, and, walking backward, covered their father's shame, and themselves "looked not upon his nakedness;" and it is little to the credit of this day and generation to reflect that, had Shem and Japheth been reared under modern conditions, when reverence is swallowed up in greed, instead of uniting to shield their father's good name and fame, they would have rushed to summon witnesses and a photographer, to preserve the sorrowful picture as evidence for use in contesting the old gentleman's will.

But the facts in the present case were all before the jury, and we must respect its verdict. We cannot say that it is an unreasonable finding. It is true that a man may be a drunkard, and yet not necessarily incapable of making a valid will. He may be grossly immoral and filthy, and still not be of unsound mind, in the legal sense of the word. He may be quarrelsome or abusive or profane or eccentric, and yet not necessarily incompetent; but, when we find very many of these characteristics uniting in a single character, and add thereto the testimony of experts that such a showing indicates a loss or decay of mentality, a verdict to that effect by the jury cannot be disregarded.

II. Assuming, then, that the case made by the contestants was sufficient to take the issue of fact to the jury, we have next to inquire whether any substantial error is disclosed in the rulings of the court upon the trial.

To some extent, what we have already said is controlling upon questions raised in the several assignments of error, but there are others which call for our consideration.

Much of the complaint made by counsel relates to the refusal by the court to instruct the jury that evidence showing that the testator had syphilis, that he frequented houses

of prostitution and indulged in other unclean and filthy practices, was immaterial, and should not be considered as having any bearing upon the question of his mental soundness. None of these objections is sound. It is true, as we have already said, that no one of such acts, practices, or habits is, as a matter of law, necessarily inconsistent with the theory of testamentary capacity; but this is not to hold that proof of such facts may not be considered, with other facts, as tending to show mental unsoundness. Men of sound mind do not, as a rule, so conduct themselves. With the normal man, a sense of shame and a regard for the decencies of life operate as some restraint upon his conduct, and this is especially true with the normal man who has outlived his youthful follies, and has left mentality enough to realize that his career is drawing to a close.

Counsel's expressed view, which is, in substance, that all men, however sane, are "tarred with the same stick," and that the only difference between indiscriminate intercourse between the sexes and their association in lawful wedlock is the "mumbling of a few words by a clergyman from a ritual," may, perhaps, be a legitimate argument, when addressed to a jury, made up of the kind of men who are popularly supposed to "hang together;" but he can hardly expect the court to give it the stamp of judicial approval, as a legal principle.

There was no error in refusing the requested instructions.

The court withdrew from the jury the charge or claim made by the contestants that the will in question was executed while the testator was intoxicated. No exception is taken to this ruling, but it is insisted that all the testimony relating to the testator's indulgence in intoxicants should also have been withdrawn. We think otherwise. The testimony as to the man's habits in this respect has a legitimate bearing upon his mental condition. Long-continued and excessive indulgence in the use of intoxicating liquors may not always undermine or destroy strength of mind in

2. WILLS: intoxication and mental competency.

the user, but it is a matter of common observation that it very frequently does have that effect, and it was the right of the contestants to have the facts, as developed by the testimony, go to the jury.

Exceptions were preserved by appellants to the overruling of their objection to certain evidence as not proper cross-examination, and other evidence as not being proper rebuttal. The extent to which cross-examination of a witness may be pursued, and the allowance of evidence in rebuttal, if not otherwise objectionable, are matters left very largely to the discretion of the trial court—a discretion which does not appear to have been here abused; and the objection cannot be sustained.

Physicians who had treated the deceased in his lifetime were examined by the contestants, over the appellant's objection, concerning knowledge so acquired by them in their professional capacity. The admission of this testimony is assigned as error, as being a violation of professional confidence, which is protected by our statute, Code Section

3. WITNESSES:
will contest:
testator's
physician as
witness.

4608. Whatever may be now said or thought upon the proper interpretation and effect of this statute as an original proposition, the objection here raised has been fully settled adversely to the contention of the appellant. *Denning v. Butcher,* 91 Iowa 425; *Winters v. Winters,* 102 Iowa 53; *Barry v. Walker,* 152 Iowa 154, 156; *In re Harmsen,* (Iowa) 167 N. W. 618 (not officially reported).

A few other exceptions are taken to rulings on matters of testimony, but we shall not extend this opinion for their discussion, as they involve only familiar principles of the law of evidence. We have examined them all in the light of the record as shown by the abstract, and find no error in them.

The judgment of the trial court is—*Affirmed.*

LADD, C. J., and STEVENS, J., concur.

GAYNOR, J., concurs in the result.