DELLA BOYLES, Appellee, v. MARY JOSEPHINE CORA, Appellant.

No. 45745.

NOVEMBER 24, 1942.

W. B. Hays and C. W. Howell, both of Centerville, for appellant.

George A. Milani, of Centerville, for appellee.

BLISS, J.—An opinion in this cause was filed October 14, 1941 (see notation in 230 Iowa 1057), and is found in 300 N. W. 281. It reversed the trial court. A rehearing was granted, and on resubmission the decree of the trial court is affirmed and this opinion is substituted for the aforesaid opinion.

On August 18, 1939, S. G. Boyles, the husband of the plaintiff, executed and delivered to the defendant a deed to a farm of 240 acres in Appanoose county, Iowa, which deed was recorded the same day. No copy of the deed appears in the record, and we are not informed of the consideration recited therein. There is evidence that the grantor reserved a life interest. The grantee was not related to the grantor by blood

or by marriage. The grantor died on January 7, 1940, intestate and without issue, leaving plaintiff as his surviving spouse.

Plaintiff's petition alleged: that the plaintiff did not join in nor have any knowledge of the execution of the deed; that the grantor at the time of its execution was of unsound mind and sick, and had been sick for a long time, and his sickness and age and other ailments and diseases were such as to weaken his mind and produce mental disturbances to the extent that he was incapable of understanding and appreciating what he was doing and the consequences of his act; that the defendant took advantage of his weakened physical and mental condition, and by playing up to and ministering to his passions obtained undue influence over him, which she exercised to procure said deed, in fraud of the plaintiff, his heirs, and creditors; that the consideration paid by the defendant was wholly inadequate and unconscionable.

Defendant by her answer admitted the relationship of plaintiff to the grantor, but denied all other allegations. The court found generally for the plaintiff.

The appellant, as grounds for reversal, urges that there was no showing of: (1) mental incapacity; (2) undue influence; (3) lack of consideration; and (4) no offer to restore the status of appellant.

Before discussing these propositions separately, a statement of matters in general, pertinent to all of these propositions, will be helpful.

S. G. Boyles, sometimes called "Stan" in the record, was approximately 66 years old at his death in January 1940. The appellee married him when she was 17 years old and that relationship continued until his death 43 years later. He had no property when they married, but by their combined efforts they acquired over 500 acres of Iowa farm land. Both of them worked hard. The appellee did her part, not only in housework but in the fields and about the farm buildings. She milked, and made butter, and attended to the poultry and eggs. Her husband was a good farmer. He was industrious and a shrewd dealer. He kept the buildings and other improvements on the farms in good repair. He raised, bought, and fed cattle for.

the market and made money at it. In those days, as one witness put it, "He always had stock and corn in the crib." He had always been a user of intoxicating liquor, but his excesses in that respect, during the years of which we are speaking, had not been so frequent. During that period, there is no evidence of any domestic trouble between them. During the "twenties," he became a member of the board of supervisors of Appanoose county, and was in that office for six years. His downfall, according to the appellee, really got under way during that period. His use of intoxicants greatly increased. He neglected the farms. He was away from home much of the time. As the appellee testified, his associates became those with whom he would not have been seen in earlier days. He became abusive of his wife by words and blows. On many occasions, she left the home for her own protection. He accused her of intimacies with other men. He sat on the porch with a shotgun in his hands many nights watching for her alleged paramours. On one occasion, after dark, but early in the evening, a taxi driver from Centerville took the appellee to her home. With the driver was a 17-year-old high-school boy—"but awful small," as the driver testified. Mrs. Boyles took her packages and went to the door. It was locked and she rattled it and tried to talk to her husband, who was inside. She and the small boy then tried to open a window. Her husband then came out and gave her a "cussing," and accused her of running around nights with men. He told the schoolboy to get off the place and stay off or he would kill him. He ordered the taxi driver not to bring her home any more. This same driver brought her to town many times "with her cream and eggs and left them at the Wagner Produce Company." The appellee testified that while she was compelled to hire taxis or to walk, the appellant was driving her husband about the town and country in his car or her own. The same taxi man testified: "* * * and I have went out many nights and got her—she didn't say, but I imagine she was scared to stay there herself." This is a conclusion, of course, but there is competent testimony of her fear of her husband when drunk. On one occasion, Mr. Boyles asked the 17-year-old son of one of his tenants to come to the Boyles home. This is the boy's testimony:

"Well, he told me to come down there one morning, and I went down and he wasn't home and Mrs. Boyles was, and I went in to wait on him and when he come he got mad and just the same as accused me of being intimate with her. He asked me what the hell I was doing there alone with his wife and he was angry."

Boyles was in the hospital for a few weeks in May and June 1939, and his nurse went home with him for a few weeks. She testified:

"After he returned home I was with him all of the time. He sat on the side of his bed one night because he thought there was a man in Mrs. Boyles's room. There was no one there. * * * Q. What did he do the next morning? A. Well, I helped him to get his bathrobe on and we walked outdoors to inspect the windows to see that they were shut. Q. Did you want to examine the windows? A. He did, I didn't."

In 1932, or about that time, Boyles killed a child accidentally with his car. Appellee testified that from then on he began to slip and slip badly. Later he struck a woman with his car on the streets of Centerville. At some time, the record does not disclose when, his license to drive an automobile was taken from him for drunken driving, but according to the appellee "it was that element—this filthy, low-down element he was running around with—got his driver's license back." In speaking of the death of the little boy, appellee testified:

"This accident must have been about eight years ago. * * * He has never rested at night after that. He said so much that summer. * * * He woke up so much at night and he could hear the little boy hitting the door of the car—that is, behind the door handle of the car—but it was an accident and it affected him. * * * He did not rest at night and drank more frequently. * * * He would run outdoors and run out to the gate and he would look through the house to see if someone was there—imagine and accuse me of being with people that I never even spoke to. After the accident he did not keep up the farm and the home."

Appellant, in support of the deed, places reliance on the fact that there was much disagreement in the Boyles home. It is true, and it is not surprising. But there is no evidence that the appellee was the cause of any lack of harmony. She instituted divorce proceedings in 1928, and at one time sued for separate maintenance. She testified: "But Mr. Boyles paid it all. He asked me to settle it, but it was his drinking and carrying around with this element that it is here today." She was bitter in her testimony respecting the appellant and those associates whom she believed had catered to his weaknesses, but the record discloses no bitterness toward her husband. She gave him her personal care to the end. There is no worthy evidence to the contrary. The special nurse who was at the home in June 1939, testified:

"Q. Now, was Mrs. Boyles there at home when you were there? A. Yes. Q. Did she try to help take care of him? A. Well not a great deal. Q. Did she make some efforts when you needed assistance? A. Yes. * * * Q. Did he appear like he was interested in her? A. Yes. Q. Did she do all she could for him? A. I was his nurse and I was supposed to take care of him, and there was no need for her to do anything personal for him. She saw to it that I had the supplies to take care of him. Q. Did she cooperate with you? A. Very much."

Appellee testified:

"Q. After he had made up his mind once, it was almost impossible to change it? A. No, I had lots of influence over that man. Q. He was a man that always run his own business, nobody told him what to buy or sell? A. They did in late years. He didn't have mind enough to know what he was doing in late years. He had the mind of a child, and I took care of him as a child most of the time. I can't see what pleasure anybody had joy riding with that man. * * * Q. During the last two or three years you stayed away from home? A. I did not. Q. The last three or four years? A. I did not because he wasn't fit to leave alone. * * * I observed some change in Mr. Boyles's physical condition during the last five or six years, also in his mental condition. He had three strokes and then he

had paralysis of his throat. He had those attacks two or three different times. It was hard to understand him. For the last two or three years I had to feed that man. He continued to drink after he had the strokes because he associated with that element—he wouldn't be caught out in broad daylight when he was himself. These strokes affected his walking and he could not carry on a conversation. I bathed him and washed him; I have changed his bed; I have fed him for the last two or three years. He got so that he would drool at the mouth. He would soil his clothes and had no pride during the last couple of years. He would just be like a little child. I could bathe him; I could change him, and maybe all of a sudden something would turn— I wouldn't know what. You had to leave him alone or get out, if you didn't want a beating. If anyone came he would cry. Tears would come. Q. Would there be any particular reason? A. No.''

Boyles' condition became such that he could not attend to his stock-buying business. He associated himself in 1936 with Robert Oden, a nephew of his wife's, a young married man, 27 years old, with no money, but a shrewd judge of horses and cattle. Boyles had been a good judge of livestock and able to do all of the necessary figuring. The young man testified:

''During the time Mr. Boyles and I were in partnership, he did not do any of the buying because he did not have confidence in himself and relied upon my judgment to do the buying. I looked after the business end of the partnership, wrote all the checks, and figured out the weights and amounts of the smaller bunches, and my father figured out the bigger bunches. The last time I sold a big bunch of cattle he [Boyles] was not able to figure it out. He got all mixed up and finally gave up as he was unable to do it. We did our partnership business with the Centerville National Bank. The bank advanced credit to both of us, but said if I would deal with him they would let him have the money, and that I was to do the business for the partnership. * * * Q. Now Mr. Oden, I want to ask you from your observation of Mr. Boyles and your transactions with him, whether in the last year you would say he was competent to

transact business and whether he is mentally competent? A. No.''

No objection was made that this question called for an opinion that was not limited to transactions and observations which the witness had detailed to the jury. Neither was any other objection made.

The testimony of Oden, with respect to the credit extended by the Centerville National Bank, was confirmed by its cashier. He testified that he saw a change physically and mentally in Boyles during the last two or three years, and ''we felt he was not capable. * * * We decided that Mr. Bob Oden, if he would look after the buying and selling of the stock, we would advance him the money. * * * Mr. Oden did the transaction of the business. Q. And he looked after the bills? A. That is right. Q. And made the checks? A. That is right.'' This witness was the administrator of the estate of S. G. Boyles.

Several witnesses who had known Boyles for many years testified to his deterioration from one of the foremost farmers of the county and a good businessman, keen and systematic in attention to his affairs, to one who grossly neglected his business and seemed incapable of attending to it. He had a paralytic stroke in one leg in 1935, another about March 1939, which paralyzed a part of his face and mouth, and another stroke about August 12, 1939, which affected his throat.

One tenant who had been on a farm of Boyles' for five years, testified that during the last two years he hardly came to the farm at all:

''He was slow thinking and his mouth would drop and his eyes pop and bulge like a man half dazed. You could not carry on a conversation with him so you could follow the trend or thought right through. And he would cry when you would talk to him and there would be no apparent reason for it. I would say the last years of his life that he was not mentally competent.''

There was no objection to the last sentence.

A receptionist in a doctor's office testified that Boyles used to come to the office in 1939 and a year or two preceding, and that during the latter part of that time his eyes were dull, he

was irritable and impatient, and "he got so he couldn't carry on a conversation—carry on a thought at all. * * * it was very disconnected * * *."

A neighbor, Guenther, testified:

"In 1939 I saw him have a temper spell of some kind while I was eating a light lunch with the Boyles, and I didn't know what happened but when I first saw him he was in what I would call a rage and finally Mrs. Boyles got him quieted down, and it wasn't fifteen minutes until he was playing. From about the 1st of November [1939], until Mr. Boyles' death I had occasion to visit the Boyles home at least twice a week, and most of the times, three times. * * * I didn't see Mr. Boyles from 1935 until 1939, and I noticed a remarkable change. * * * I bought Mr. Boyles's hay about the 1st of November * * *. I did not cheat him in buying the hay because I have more conscience than that. He was not able to take care of himself and I saw to it that he made a good contract. I knew when I was making this contract that he was not competent."

Engle, a tenant, testified as to Boyles' mental deterioration from what it had been, and further:

"The last couple of years I drove him a number of times. I recall the time he came to my house with one shoe on. Well, he come up there and had his overalls on backwards; the bib you know, was on the back, and he had one shoe on and one rubber, and he wanted to come to town to the doctor. * * * I took him to the hospital in that shape. * * * After the first time he was taken to the hospital [May 1939] if you would talk to him or go up to see him he would break down and cry. There would be no reason—just ask him how he was and it seems like he would break down and cry. During the last year or two, Jack Oden wrote checks for him."

McCann, a neighbor, who knew Boyles almost 40 years and who had many business deals with him, had arranged in April 1939 to furnish seed corn to a tenant of Boyles'. The tenant was to pay for part, and Boyles was to pay for part. The witness returned in May to close the transaction. Boyles had no memory of the transaction. He was irritable and irrational, and seemed

to think someone was trying to hold him up or put something over on him. On one of these visits:

"He railed out on his wife with considerable abuse and called her considerable vile names, and it appeared the only thing that provoked this occasion was that she had her hair either fixed or dyed—I didn't make up my mind which. He and I left the house and I was talking with him and told him I saw no harm with it; * * * but he didn't seem to take any notice, but on that occasion he did sit down and cry. I couldn't find the cause of it and I left him in that condition."

Without objection of any kind, and with no motion to strike, this question was asked and answered:

"Q. Now, Mr. McCann, from your opportunity to have observed Mr. Boyles, from his early manhood down to the time of his death, would you say during the last year of his life that he was mentally competent to transact business? A. I wouldn't want him handling my business in the frame of mind I judged him to be."

On cross-examination by appellant, this occurred:

"Q. Did you sell him that seed corn? A. No. In the second negotiations there I didn't consider him in a frame of mind to deal on. Q. Did you get a little mad at him when he wouldn't buy the seed corn? A. No, I realized the situation."

Other witnesses told of similar experiences with him, and of his striking a horse in the head with a hammer, and another with a pitchfork. Things he never did before.

Another nurse attended him in the hospital in June 1939. One of his ailments was an infected arm. The appellant testified that Boyles told her the appellee bit him on the arm. Appellee denied this, and the attending doctor, the nurse, and even the appellant testified there was no mark on the arm, except a hypodermic-needle puncture. This nurse testified that he was very melancholy and depressed, irrational, cried frequently, imagined a lot, thought bridge builders were working in the room, and had to be watched all the time. She also took care of him from December 28, 1939, until he died of a cerebral hemorrhage

on January 7, 1940, and testified: "Well, his condition was about the same. He wasn't as hard to manage the last time, but I was able to take care of him on twenty hour duty, but he was about the same. * * * His mental condition was poor. * * * and he had just a general depressed mental condition."

Dr. C. M. Davis, a regularly licensed physician and surgeon, who had practiced 25 years in Centerville, was a member of the county insane commission. On July 22, 1939, Mrs. Boyles was before the commission on an information filed by Mr. Boyles. Boyles appeared with one witness. The doctor testified:

"Well, we simply had a hearing and heard the witnesses and we decided there was insufficient evidence to hold this woman as being insane. During the progress of the examination, Mr. Boyles was a witness and could not remember what his age was, and stated that he didn't think his wife was insane, and that she shouldn't be sent to the hospital for treatment. And he further stated that he wanted to live with his wife."

The next day Boyles said to the doctor: "What in hell did you fellows mean by the way you did yesterday? You turned a raving maniac loose on me and I am afraid she will kill me." The doctor tried to explain to Boyles the inconsistent positions he had taken, and testified: "* * * but he didn't seem to understand what I was talking about. He didn't follow my explanation. I talked to him a little bit and [he] seemed to be in a daze—didn't exactly understand this thing."

A week or so later the appellee talked to the doctor and asked his opinion about Boyles. For answer, the doctor testified he told her "not to pay any attention to what he said or what he did because I considered he was insane." The doctor never treated Boyles until September 18, 1939, and November 2, 1939, was the last time he attended him. As a witness for the appellee, he testified on direct examination:

"Q. I am going to ask you whether at that time he had any delusions or imaginations of any kind? (Mr. Hays: Same objection; being in violation of Section 11263.) [The record does not disclose what the words, "Same objection" refer to.] A. Well, at that time he thought when he first came to see me

there was something on him—something in the nature of bugs—
something of that kind. * * * He responded to treatment.
His blood pressure was high and he had nephritis * * * He used
alcoholic intoxicants. Q. I want to ask you, doctor, what you
would say the condition was that existed the last year or two of
his life—what ailment did he have? (Mr. Howell: We object
to this question for the reason this witness has not been properly
qualified as an expert, and also as in violation of Section
11263.) A. I thought Mr. Boyles was suffering from senile
dementia aggravated by the excessive use of alcohol. The use
of alcohol aggravates this ailment. Senile dementia is a
progressive disease. In some persons it works faster than in
others. I think it affected Mr. Boyles's judgment. Q. Now, I
want to ask you whether in your opinion he had senile dementia
on August 18, 1939? (Mr. Howell: That is objected to as
calling for evidence from a witness who has already said the
first time in that period that he saw him was September 18,
1939, and the only period before that was on July 22, 1939.) A.
He had been to my office four times before August 18. Of course
I would see him on the street. Q. Now, I want to ask you
whether or not in your opinion Mr. S. G. Boyles was insane
on the 18th day of August [1939, the day the deed was
executed] and incompetent to make a deed? [There was no
objection to this question.] A. Well, I would say he was in-
sane and incompetent to make a deed.''

There was no error in the examination of this witness.
Other doctors who attended Boyles were witnesses for the ap-
pellee. Appellant objected that the provisions of Code section
11263 respecting confidential communications between physician
and patient were thereby violated. We will discuss this matter
a little later herein.

Dr. Hoogendorn, a regularly licensed chiropractor of over
22 years' practice, over the objection above noted, testified that
he was acquainted with Boyles and that he had treated him the
last time on August 18th or 19th, 1939, and on being asked
what he observed and found, testified:

''Well, I had taken his blood pressure and I observed that
his systolic was about 240 and his diastolic was about 130, and

he had previously had a stroke of paralysis, and his voice was rather incoherent and his face was drawn, and I chose not to treat him for fear he might have a stroke, for my own protection.''

Dr. Wheeler, a regularly licensed and practicing osteopathic physician and surgeon of about 25 years' practice, testified that he knew Boyles from 15 to 18 years, and that he was his patient in 1936, 1937, 1938, and 1939. Over the objection that the questions called for confidential communications under section 11263, in answer to what was Boyles' general physical and mental condition, he testified:

''Well, in the last two or three years preceding his death his general mental and physical condition was a gradual and fairly consistent deterioration—that is to say, a certain degeneration of body and mind tending toward premature senility. In fact, that is the condition that existed during the last year or two of his life—senility of body and mind. Q. * * * Did he show emotional instability? A. Very pronouncedly so in the last few years of his life. Of course, in the early years of his life he was more or less a substantial farmer and business man, but as disease crept over him there was a marked change took place, tending toward a worse condition as time went on. * * * arteriosclerosis, from which he was suffering * * * His arteries were quite stem-like, characteristic of the typical case of arteriosclerosis. His coordination wasn't very good. * * * His reflexes were abnormal. * * * The stench of bad liquor was on his breath every time I saw him. He was soaked in it every time I saw him. He told me he was a chronic user of intoxicating liquor, and of course, I saw evidence of it every time I saw him. * * * Some cells in the brain are entirely destroyed by alcohol and some are only temporarily impaired, and any man that drinks alcohol to excess at least temporarily impairs many functions of the cells of the brain, and if it is continued long enough some of the cells in the brain are entirely destroyed beyond any hope of recovery. Q. Doctor, I want to ask you from your observation of this man and intimacy in the last two years, whether he was capable of thinking along a sound and logical line and capable of exercising

sound and reasonable judgment? [Objection was made that the witness was not qualified as an expert, and the question was not in proper form.] A. * * * it would be clearly evident to an unprejudiced doctor that the man was mentally unsound and was not capable of sound analytic reasoning in all things.''

Dr. R. R. Edwards, a regularly licensed physician and surgeon, practicing in Centerville since July 1936, was a graduate of the Iowa Medical School at the State University of Iowa. Boyles was his patient for a little more than three years. Over objection that the question called for incompetent testimony, being privileged and barred under section 11263, he diagnosed Boyles' ailment as arteriosclerosis, particularly affecting the brain and kidneys, aggravated by alcoholism into a state of dementia, manifested by loss of memory, emotional instability, and fits of anger, and crying without any apparent reason. Without objection, he testified that his physical condition, as described, affected his mental faculties, and made him incompetent to react in a normal manner.

On August 12, 1939, Boyles had a stroke particularly affecting his throat. On August 15th, he accompanied his partner, Oden, and the latter's wife, into Nebraska, on a cattle-buying trip. Oden bought and paid for the cattle before Boyles saw them. Boyles' physical condition was not good and they stopped for a night on the way back. The night before he left for Nebraska he could eat nothing but liquids and he drooled excessively. Of his return, the appellee testified:

''I think he came back Thursday evening, August 17, 1939. He could hardly walk and he couldn't talk. He just shook his head. I fed him with a spoon, oyster soup I think it was. He certainly didn't rest well that night. I remember him leaving the morning of August 18, 1939. He was very well until after breakfast. I was talking over the phone and he came in and started cussing me because I was talking on the phone. I called my niece to get the law. Fred Milani come and I believe he told Fred to take him home. I couldn't do a thing with him. I told Fred to take him to the doctor. He came home between four and five. * * * He was a sick man. Q. Would you say he

was of unsound mind? (Mr. Hays: That is objected to as leading and suggestive.)   A. Yes, sir.''

Instead of taking him to a doctor, Milani took him to an abstracter and procured a deed from Boyles conveying to Milani's wife, who was a niece of Boyles', 86 acres of land, and a residence property.   Milani then delivered Boyles to the appellant, who took him in her car to an attorney to procure the deed involved in this case.   Because of Boyles' condition, the attorney telephoned Dr. Edwards, Boyles' doctor, and asked about him.   The doctor told him Boyles was a sick man and should be home in bed.   Without any discussion with the doctor about the business at hand, the deed was prepared.   Boyles pointed out the land on the plat.   The attorney suggested and put in the deed a life reservation for Boyles.   The latter reluctantly acceded to this, and asked that the deed reserve to him the right to sell the land.   The attorney told him this would invalidate the deed, and refused to incorporate this provision. The appellant and Boyles left the attorney's office, and took the unsigned deed to a justice of the peace.   The latter testified on cross-examination:

''Mrs. Cora was with him.   He was there for me to take an acknowledgment to a deed.   That was the deed from him to Mary Josephine Cora.   He wanted to put in a clause reserving the right to sell the land during his life time.   I believe that Mrs. Cora objected to the change.   I told Mr. Boyles I thought it would make a bad deed and he had better see a lawyer.   The deed was unsigned when he left the office.''

On redirect examination by appellant's attorney, the witness testified:

''I didn't insert the clause because I thought it would make a bad deed—invalidate the deed.   I don't remember just what Mrs. Cora said but I know she said put it in—it would be all right.''

On re-cross examination, he testified:

''Mr. Boyles thought it should be in.   I didn't put it in because I thought it didn't belong there.   Mr. Boyles wanted it in.''

It was not put in, and the appellant, with Boyles and the unsigned deed, continued the search for another scrivener, and they came in the afternoon to the abstracter who had prepared the deed to Maizie Milani that morning. He testified:

"They had a deed already filled out but not signed and no acknowledgment. Mr. Boyles wanted to make some changes in the deed. He wanted to put in a clause allowing him to sell the property. Mrs. Cora said that she didn't want it that way. She objected to any changes in the deed. I told Mr. Boyles that I wouldn't make any changes in the deed. He had already had his attorney prepare the deed and I wouldn't change it. * * * When people come in for [a] deed I don't examine them as to their mentality and ask them questions about it."

Boyles signed the deed there.

The appellant recorded the deed and she took Boyles to the Fred Milani home, and Milani took Boyles to his own home.

The appellee knew nothing of the execution of either deed until she read of their recording in the paper. Mrs. Milani deeded the 86 acres back to the appellee, and the appellee executed a deed to Mrs. Milani of the residence property which Boyles had conveyed. When this was done does not appear. The residence property had been the old home of Mrs. Milani's parents.

The appellant, on both direct and cross-examination, stated that neither the appellee nor Boyles had ever asked her to convey the property back to either of them. But after the noon luncheon, she stated that she wished to correct her testimony. She then testified:

"I got confused about this West matter. There was so much there that I couldn't recollect myself. * * * I couldn't remember. * * * Stan just wanted it at that time to keep his wife quieted down. * * * At Stan's suggestion I went to Mr. West to have a deed made back to Stan. He said that his wife had made so much fuss when it came out in the paper that he thought it the best thing to make a deed to quiet her and later he would deed it back the same as the first deed. Mr. West said I would have to have my husband sign and when I told this to Stan he told me to just drop it."

A witness testified to seeing Boyles at the appellant's home on the day the deed was executed:

"* * * we seen him at Mary Josephine Cora's. We couldn't understand what he had to say—couldn't hardly talk. I could smell liquor on his breath. * * * She [Mrs. Cora] was standing in the door. Mr. Boyles came out of the house. He said something about she was his girl friend. She just gave a friendly smile towards him."

According to the testimony of appellant and her husband, Boyles had been coming to their house daily or nightly since 1931 or 1932. He averaged one meal a day there during this time. He was usually drunk coming or going. She testified: "He always drank as long as I knew him. *He was drinking all the time but he wasn't always intoxicated.*" (Italics supplied.) They brought liquor to their home for him. His car was seen at some time of almost every day or night parked in the street in front of the Cora home, or in the back yard during these eight or nine years. She testified: "I didn't think there was anything wrong with his parking his car in back of my house for eight or nine years, nor did I think there was anything wrong with driving him around the different parts of the country, and to sit down and drink with him." She was half his age. She played up to his weaknesses, as appears from her testimony: "He never got angry or provoked around me. He didn't have any reasons to for I didn't do anything to get him mad at me. I always did what he asked and he thought I would whatever he asked for. I would humor him along and try to give him whatever he desired, and would do as he asked. * * * *And he had confidence in me, and would confide in me, and this relationship of trust and confidence existed down to the time of his death.*" (Italics supplied.) In the summer of 1939, after he had been in the hospital in May and June, and was not in the nurse's care at home, Bob Oden and the appellant took Boyles to Hot Springs, where they remained ten days.

When Boyles was in the hospital at this time, and was very low, the appellant called there a number of times to see him, but was not permitted to by the Sisters, the doctor, and the

nurse. She called at the Boyles home when he was sleeping, and became angry because the nurse would not let her in.

Appellant's husband testified:

*"I would take care of his [Boyles'] business and go to sales with him. * * * Mr. Boyles didn't have to depend upon me to do his business when I first knew him."* (Italics supplied.)

There was testimony of some lay witnesses that, from their observation of Boyles, they were of the opinion that he was competent to look after his affairs. Some doctors, in answer to hypothetical questions, stated that in their opinion Boyles was sane. The probative value or weight of such opinions depends much upon how fairly and fully the factual premises conform to the evidential record. Many items of testimony which would have been very informative to these witnesses were omitted from the questions. Other premises were included that had no basis in the record. One of these experts testified that, "As soon as a person is born he exhibits traits of senility."

Some of the opinion testimony relied upon by appellant, which was properly objected to, was incompetent. The attorney who drew the deed in question, without detailing the facts to the court, testified that from his "knowledge of [Mr. Boyles] gained prior to that time and from the knowledge and observation of Mr. Boyles gained at the time I made out that deed," he was mentally competent. Another lawyer, without giving any facts, who had attended to some legal matters for Boyles, but who did not see Boyles on the day the deed was executed, testified: "I would say he was competent to make a contract on August 18th, 1939. I would say he had sufficient mind and mentality on the 18th day of August [1939] to appreciate the effect of making a deed."

The remaining ground upon which the appellee based her prayer for relief, was that the consideration for the land was "wholly inadequate and unconscionable." We are not informed as to what, if any, consideration was recited in the deed. We are not certain whether appellant and her husband claim the property as a gift, or for a consideration. The farm contained 240 acres. Appellant's husband testified that it was

worth $35 an acre, or $8,400. There was a coal mine on it, the royalties from which fairly approximated $1,000 a year. .

Appellant and her husband testified that in 1931 or 1932, Boyles began bringing his shirts to her every week to launder, and twice a month she cleaned and pressed his pants, and from that time on he averaged one meal a day at her place. She and her husband drove him about. For these services, each of them testified that they charged Boyles nothing, and that they did not expect any pay, and never asked for any. She testified:

"When he would offer to pay I would say I was just doing it as a favor * * * I would drive him around because he felt that he wasn't as strong as he had been. * * * I would drive him where he wanted to go and many times I wouldn't take any money for it; I felt it was just like helping him; we didn't want the money. * * * If he ate somewhere else it would be about a quarter a meal. Farmers charge about 25 or 35 cents a meal for harvest hands."

The foregoing fairly summarizes all of the testimony respecting any consideration for the deed. That neither appellant nor her husband ever considered these services as consideration is evident from the fact that each testified that Boyles talked of giving Mr. Cora a farm before any of the services had been rendered. The record fully establishes the allegation of the petition that the transaction was an unconscionable one, and without consideration worthy of the name.

The contention of the appellant that the appellee made no offer to return, and has not returned, the consideration received by Boyles, nor restored the appellant to the status which she had occupied before receiving the deed, is without any basis or justification, for the appellee is under no such obligation.

I. As we have already stated, we find no merit in the objection of the appellant that the doctors who had attended Boyles professionally were incompetent as witnesses for the appellee, and their testimony was incompetent, because in violation of section 11263, Code, 1939. This section is as follows:

"No practicing attorney, counselor, physician, surgeon, or the stenographer or confidential clerk of any such person, who

obtains such information by reason of his employment, minister of the gospel or priest of any denomination shall be allowed, in giving testimony, to disclose any confidential communication properly intrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline. Such prohibition shall not apply to cases where the party in whose favor the same is made waives the rights conferred.''

This section has been construed to include observations, as well as communications.

Since the statute is for the benefit of the patient, he, of course, may waive the privilege accorded him. And the statute so provides. But it is silent as to the right or power of anyone else to waive that privilege after the death or incapacity of the patient. The decisions of the courts are not in harmony respecting this matter. They are divided with respect to the existence of the right of waiver, at all, and also as to who may exercise the right.

We have not heretofore been called upon to decide the identical question of whether the surviving spouse of one who died intestate and childless may waive the privilege for the protection of the rights of the survivor in the estate, or property, of the deceased, but we have come so close to it in a number of decisions as to point the way to the correct answer in this case.

The husband of appellee died intestate and without issue surviving him, so that she is entitled to the share of his estate as provided in section 12017, Code, 1939, or to the whole of his estate to the amount of $7,500, and to one half of the estate in excess of that amount. She thus had an interest in her husband's property and estate, and an interest in preventing its depletion by any wrongful, invalid, or unlawful conveyances of her husband's property. One third of the estate, or her dower, or distributive share therein, she is entitled to as his surviving widow. The excess over one third to which she was entitled under section 12017 she took as an heir of her deceased husband. In either capacity, she was entitled to waive the privilege conferred upon her deceased husband by section 11263 of the Code.

This question first came before this court in Denning v.

Butcher, 91 Iowa 425, 436, 59 N. W. 69, 72. This was an action to set aside a will, in which we held that the testimony of the testator's physician, as a witness for the executor, respecting the physical and mental condition of the testator was admissible. The court said:

"May the representatives of deceased waive the prohibition of the statute in such a case? There is no question that the settled practice in this state has been to receive the testimony of the attending physician, touching the testator's physical and mental condition at and prior to the time of the execution of the will; and unless the reasons are obvious and urgent, and a proper construction of the statute requires it, no rule should be established which will set aside a practice long recognized as proper and necessary. * * * The rule invoked by appellants is 'one of privilege, for the protection of the patient and he may waive it if he sees fit; and what he may do in his lifetime those who represent him after his death may do for the protection of the interests they claim under him.' Frazer v. Jennison, 42 Mich. 209, 3 N. W. Rep. 882. * * * While the authorities are not in entire harmony, we think the better rule is that the prohibition of the statute may be waived either by the testator, or, after his death, by those who stand for him, and in this case by the executor."

In Winters v. Winters, 102 Iowa 53, 57, 71 N. W. 184, 185, 63 Am. St. Rep. 428, the widow of the testator, named by him as executrix, offered his will for probate. The testator's brother contested the probate, and offered the deposition of the doctor who had attended the testator in his last illness respecting his mental capacity. The proponent's objection to the incompetency of the interrogatories was sustained. In holding this was error, the court, speaking through Justice Ladd, said:

"On the authority of Denning v. Butcher, 91 Iowa, 425 (59 N. W. Rep. 69), this evidence, if offered by the proponent, should have been received, though no executor had been appointed. Ought it to be rejected when offered by an heir at law? At common-law, confidential communications to a physician, were not privileged, and they are only so made by statute.

Those to an attorney, however, were privileged, and it was held that the attorney might not divulge without the consent of the client while living, but that, after his death, in a contest between a stranger and an heir, devisee, or personal representative, the latter might waive the privilege and examine the attorney concerning the confidential communications, though the stranger was not permitted to do so; and, in a controversy between heirs at law, devisees, and personal representatives, the claim that the communication was privileged could not be urged, because, in such a case, the proceedings were not adverse to the estate, and the interest of the deceased, as well as of the estate, was, that the truth be ascertained.''

With reference to decisions holding that an executor might waive the privilege but that an heir at law could not, the opinion states, on pages 58, 59 and 60 of 102 Iowa, page 185 of 71 N. W.:

''These decisions are based on the ground that the executor or devisee represents the deceased, and the evidence is offered to sustain the will, which it is the policy of the law to maintain. The particular vice in the reasoning in these cases, in making the distinction between the heir at law and the devisee, is the assumption that the paper in dispute is the will of the deceased. The statutes are for the benefit of the patient while living and of his estate when dead. The very purpose of the contest is to determine whether the deceased in fact made a will, who shall be his representative, and who is entitled to his estate. If he did not have testamentary capacity, then the paper was not his will, and it is not the policy of the law to maintain such an instrument. It is undoubtedly the policy of the law to uphold the testamentary disposition of property, but not until it is ascertained whether such a disposition has been made. The same presumptions are indulged in favor of the validity of the will as of other written instruments. The paramount purpose in the first instance should be to ascertain whether the instrument presented is in fact the will of the deceased. And no one can be said to represent the deceased in that contest, for he could only be interested in having the truth ascertained, and his estate can only be protected by establishing or defeating the instru-

ment as the truth so ascertained may require. The testimony of the attending physician is usually reliable, and often controlling, and to place it at the disposal of one party to such a proceeding and withhold it from the other would be manifestly partial and unjust. Such testimony, ordinarily, relates to the capacity of the deceased, and could rarely be perverted to the injury of character. * * *

"It is not very material to the result whether we say the heir or devisee may, in the interest of the estate of the deceased, waive the privilege, or that the statute does not apply to a case where the proceedings are not adverse to the estate, and the interest of the deceased as well as his estate could only be the determination of the truth. In either event we hold that in a dispute between the devisee or legal representative and the heirs at law, all claiming under the deceased, the attending physician may be called as a witness by either party. Thompson v. Ish, 99 Mo. 160 (12 S. W. Rep. 510)."

The Denning case and the Winters case have frequently been quoted with approval.

Altig v. Altig, 137 Iowa 420, 422, 114 N. W. 1056, 1057, was a suit by heirs of Henry Altig to set aside his conveyance of a tract of land to his son, a defendant in the suit. A daughter of the grantor was one of the plaintiffs. The petition alleged the mental incapacity of the grantor, and the procurement of the deed by fraud and undue influence. Plaintiffs were denied relief and they appealed. In affirming, this court said:

"Objections to the testimony of the attending physician of grantor were not well taken. In a contest between heirs, a physician's testimony as to the physical and mental condition of the common ancestor is admissible." (Citing the Winters case.)

Other expressions of this court, or decisions holding that in a will contest an executor, devisee, or an heir may waive the privilege, are Barry v. Walker, 152 Iowa 154, 156, 128 N. W. 386; Kirsher v. Kirsher, 120 Iowa 337, 343, 94 N. W. 846; Shuman v. Supreme Lodge, 110 Iowa 480, 483, 81 N. W. 717; In re Estate of Swain, 189 Iowa 28, 34, 174 N. W. 493; Long v.

Garey Investment Co., Iowa, 110 N. W. 26. (An administrator in suits to set aside deeds and bills of sale may waive the privilege.)

The rule of these decisions of this court .have the support of the weight of decisions and other authority. In New York the statute has been amended so as to expressly list spouses among those who may waive the privilege. In Groll v. Tower, 85 Mo. 249, 55 Am. Rep. 358, the widow, suing for damages for the death of her husband through negligence, was permitted to use the testimony of the doctor who attended her husband. In Schornick v. Schornick, 25 Ariz. 563, 220 P. 397, 31 A. L. R. 159 (see latter report for extended brief on the question), the matter of waiving this privilege is fully and ably discussed. In that case the plaintiff, who was a doctor, was seeking to set aside the deed of his deceased father to the latter's wife. The son attended his father and was permitted to testify as to the mental condition of his father. The reason for permitting the waiver, as stated by Justice Cooley, in Fraser v. Jennison, 42 Mich. 206, 3 N. W. 882, and in Thompson v. Ish, 99 Mo. 160, 176, 12 S. W. 510, 514, 17 Am. St. Rep. 552, both cited with approval in Denning v. Butcher, supra, 91 Iowa 425, 437, is thus expressed in the Missouri case:

"If the patient may waive this right or privilege for the purpose of protecting his rights in a litigated cause, we see no substantial reason why it may not be done by those who represent him after his death, *for the purpose of protecting rights acquired under him.*" (Italics supplied.)

In Sprouse v. Magee, 46 Idaho 622, 269 P. 993, the husband, in his own right and as guardian of his children, against the defendant for malpractice resulting in the death of his wife, was not permitted to introduce testimony of physicians who had attended the deceased. This was held error. The opinion reviews the authorities at length. Other cases touching upon the question are: Grieve v. Howard, 54 Utah 225, 180 P. 423 (action by special administrator of deceased grantor to set aside deed); Bruington v. Wagoner, 100 Kan. 10, 164 P. 1057, 1060 (one set of heirs seeking to set aside deed to another set of heirs. Plaintiffs were held entitled to waive the privilege. The court said: "It should not be forgotten, either, that de-

fendants were in court merely in their capacity as defendant grantees of deeds and assignments whose validity was being challenged by the heirs at law.''); Olson v. Court of Honor, 100 Minn. 117, 110 N. W. 374, 8 L. R. A., N. S., 521, 117 Am. St. Rep. 676, 10 Ann. Cas. 622 (a suit by husband and children to collect insurance on policy on life of the wife and mother). Many cases on the subject are collected in 31 A. L. R. 167 et seq., and in 126 A. L. R. 380 et seq.

If executors, heirs, legatees, and devisees in will contests may waive the privilege of the statute to protect their rights under the will of the testator, or in his property, and if administrators and heirs may waive the privilege in suits to set aside conveyances in order to protect their property rights, we know of no sound reason why a surviving spouse may not waive the privilege in an action to set aside an alleged wrongful deed of a deceased spouse, in order to protect the dower or distributive share in the property so disposed of. The rights of the widow in the estate of her deceased husband are fixed by statute, by the same authority which specifies the rights of heirs. These rights of appellee are on a plane as high as those of an heir, and of similar character, and are as much entitled to protection. The widow is as certainly entitled to waive the privilege of the statute as is an heir, or a devisee having no relationship to the testator, or as an executor or administrator, who may have no real interest in the estate. It is our conclusion that in such case the surviving spouse may waive the privilege accorded to the deceased spouse by said Code section 11263. Most certainly, under our express holdings, the appellee, as an heir of her deceased husband of that part of his estate in excess of her one third, or dower, or distributive share, under section 12017, Code of 1939, was entitled to waive the statutory privilege. Someone, perhaps, may say that we have held that a surviving spouse is not an heir of the deceased spouse. We have so held in certain instances, and in construing the ''anti lapse statute,'' section 11861, Code, 1939, and corresponding sections in the earlier Codes, and in construing a section cognate to the latter section, namely, section 12016, Code, 1939, and its earlier corresponding sections. Among such cases so holding are Black-

man v. Wadsworth, 65 Iowa 80, 21 N. W. 190; Schultz v. Schultz, 183 Iowa 920, 926, 167 N. W. 674; Boyd v. Feedan, 192 Iowa 1036, 185 N. W. 995; Murphy v. Murphy, 190 Iowa 874, 179 N. W. 530; In re Estate of Farrell, 205 Iowa 331, 217 N. W. 876; In re Estate of Bradley, 210 Iowa 1013, 1020, 231 N. W. 661; McAllister v. McAllister, 183 Iowa 245, 248, 167 N. W. 78.

But, in every case which we have found in which it was necessary to decide the character of the estate in the property in excess of the one third, or dower, or distributive share, to which the surviving spouse was entitled under section 12017, Code, 1939, or its corresponding sections in earlier Codes, this court has held that this excess portion passed by inheritance and was taken by the surviving spouse as an heir. Such has been the uniform holding or expression of this court from the case of Clark v. Griffith, 4 (Clarke) Iowa 405, 408—where the entire half interest taken by the wife was described as an inheritance—down through Burns v. Keas, 21 Iowa 257, 263, 264; Dodds v. Dodds, 23 Iowa 306; McGuire v. Brown, 41 Iowa 650, 657; Smith v. Zuckmeyer, 53 Iowa 14, 16, 17, 3 N. W. 782; Linton v. Crosby, 54 Iowa 478, 481, 6 N. W. 726; Phillips v. Carpenter, 79 Iowa 600, 44 N. W. 898; Ruppin v. McLachlan, 122 Iowa 343, 347, 98 N. W. 153; Hays v. Marsh, 123 Iowa 81, 85, 98 N. W. 604; Wild v. Toms, 123 Iowa 747, 749, 99 N. W. 700; Wilcke v. Wilcke, 102 Iowa 173, 183, 71 N. W. 201; Wright v. Breckenridge, 125 Iowa 197, 201, 101 N. W. 111; Kuhn v. Kuhn, 125 Iowa 449, 454, 101 N. W. 151, 2 Ann. Cas. 657; Monroe v. Servis, 179 Iowa 583, 585, 586, 161 N. W.. 653. The decisions in these cases have never been reversed. Such holdings were conceded in Blackman v. Wadsworth, supra, 65 Iowa 80, 84, 21 N. W. 190; Braun v. Mathieson, 139 Iowa 409, 413, 116 N. W. 789; and McAllister v. McAllister, supra, 183 Iowa 245, 249, 167 N. W. 78. They have never been questioned except by the purest obiter dicta, or passing expressions of the court, wholly unnecessary to the decision of the matters before the court. The first of such dicta appeared in Schultz v. Schultz, supra, 183 Iowa 920, 926, 927, 167 N. W. 674, 676. The opinion there states that what the court meant in Smith v. Zuckmeyer et al., supra, 53 Iowa 14, 3 N. W. 782, was that this excess one-

sixth interest over one third was merely taken "by virtue of the statute" and not as an heir. Besides being dictum and contrary to the express language of those cases, it is a pointless statement, since there is no common-law descent in Iowa and all rights of dower, distributive share, or heirship, in property, are provided solely by statute. This dictum in the Schultz case was repeated by quotation in In re Estate of Noble, 194 Iowa 733, 738, 190 N. W. 511, 26 A. L. R. 86, and again reaffirmed in Brotherhood of American Yeomen v. Shine, 196 Iowa 554, 194 N. W. 362, in each of which cases it was also dictum and wholly unnecessary for a decision.

The testimony of Doctors Davis, Hoogendorn, and Wheeler, and of Mrs. Paul Callen, doctor's receptionist, were not violations of Code section 11263. This section, with respect to the privileged character of communications by the patient to the doctor, and observations of the latter by the doctor, particularly within the more recent years, has been criticized as having but little justification for its existence, and of effecting great injury to the cause of justice by the suppression of useful truth, the disclosure of which ordinarily could harm no one. Wigmore on Evidence, section 2380 et seq. In a number of decisions, other than those already cited, we have limited the scope of this particular privilege. See State v. Grimmell, 116 Iowa 596, 598, 88 N. W. 342; State v. Height, 117 Iowa 650, 653, 91 N. W. 935, 59 L. R. A. 437, 94 Am. St. Rep. 323; In re Harmsen, Iowa, 167 N. W. 618; In re Insanity of Fleming, 196 Iowa 639, 195 N. W. 242; State v. Murphy, 205 Iowa 1130, 1137, 1138, 217 N. W. 225.

In keeping with the underlying thought and purpose of the decisions of this court supporting our holding in this division of the opinion, we quote the comment of the very able Chief Justice Lamm of the Supreme Court of Missouri, in a concurring opinion in Epstein v. Pennsylvania R. Co., 250 Mo. 1, 41, 156 S. W. 699, 712, 48 L. R. A., N. S., 394, Ann. Cas. 1915A, 423, involving the patient-physician statute of that state, to wit [quoting from Green v. Terminal R. R. Assn., 211 Mo. 18, 35, 109 S. W. 715, 720]:

" 'It is obvious, the language of the statute is of such sort

that its interpretation and application are troublesome. But, because the task is difficult, shall it be made easy by ignoring it? or by applying the statute automatically to every case and all information? On the one hand, it might be so construed as to fritter away the provisions of the law. On the other hand, it might be so literally construed as to work great mischief in the administration of justice. The ultimate object of every judicial inquiry is to get at the truth. Therefore, no rule of law standing in the way of getting at the truth should be loosely or mechanically applied. The application of such law must be with discrimination so that it may have the legislative effect intended for it and yet the investigation of the truth be not unnecessarily thwarted.' ''

The decree of the trial court was clearly right. The allegations of the petition are sustained by substantial evidence and the appellee is entitled to the decree. We do not find that .the mind of Boyles was such that he had no comprehension or appreciation of his property or of his rights therein, or of its proper disposition. There was testimony that he regretted the giving of the deed. . Also, on the day the deed was procured from him, he protested to each of the three men to whom the defendant took him that he wished to reserve the right to resell the property. But he protested in vain. The appellant was with him at all times on this day until she secured and recorded the deed. She objected to any such reservation being placed in the deed. He was under her constant domination, and was so weakened in body and mind and so incapacitated mentally that he was unable to effectually resist her demands. The deed was her act and not his. The fact that within a few hours he gave away over a half section of farm land and a residence property in town, wholly disregarding the rights of the wife who had labored for years to acquire and preserve it, is convincing proof of his mental incompetence and the dominance of those who secured the conveyances.

While the appellee made no claim of confidential re-.lations between Boyles and the appellant, and assumed and successfully carried the burden of establishing fraud and undue influence, under the record, the obligation was upon the ap-

pellant to show that the transaction was fair in all respects. She fell far short of doing this. Both she and her husband were incompetent to testify to communications and transactions with Boyles, because of section 11257, Code, 1939. The proper objection was made and much of their testimony cannot be considered. Section 11257 does not specifically state that the spouse of the person deceased or under disability may object to the introduction of the adverse testimony, and we have said that the spouse does not come within the terms "heir at law" and "survivor" used in the section, but in the same decision, French v. French, 84 Iowa 655, 658, 659, 51 N. W. 145, 15 L. R. A. 300, we have held that the spouse is included in the words "next of kin" as used in the statute. See, also, Campbell Banking Co. v. Cole, 89 Iowa 211, 213, 56 N. W. 441, and Clark v. Ross, 96 Iowa 402, 410, 65 N. W. 340. The objection to the competency of the appellant and her husband was good.

The judgment and decree appealed from is affirmed.— Affirmed.

WENNERSTRUM, C. J., and STIGER, SAGER, OLIVER, HALE, and GARFIELD, JJ., concur.

MITCHELL, J., dissents.

MITCHELL, J. (dissenting)—I find myself unable to agree with the majority and respectfully dissent. My views concerning this case are set out in the original opinion filed by this court on October 14, 1941, and reported in 300 N. W. 281.